LEWIS S. AND ROSE M. JACOBSON, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63483–63486, 65629.  Filed July 14, 1959.

*Herman H. Krekstein, Esq.*, and *Merle A. Wolfson, Esq.*, for the petitioners.

*Stephen P. Cadden, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined the following deficiencies in income tax and additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for the year 1951:

| Docket No. | Deficiency | Addition to tax for substantial underestimation |
|---|---|---|
| 63483 | $3,155.59 | ———— |
| 63484 | 8,820.40 | $529.22 |
| 63485 | 4,515.29 | ———— |
| 63486 | 18,245.21 | ———— |
| 65629 | 10,128.64 | 1,028.74 |

[1] Proceedings of the following petitioners are consolidated herewith: Joseph and Rose Facher, Docket No. 63484; William and Ruth Schmitz, Docket No. 63485; Morris and Ida Winograd, Docket No. 63486; Estate of Morris Kanengiser, Deceased, Joseph Facher, Executor and Estate of Fannie Kanengiser, Esther Weiner, Sidney Kanengiser, Marvin Kanengiser, and Irving Kanengiser, Executors, Docket No. 65629.

A deficiency determined for the year 1952 in Docket No. 65629 has been conceded by petitioners.

The issues to be decided are (1) was Hudson Towers, Inc., a collapsible corporation under section 117(m), I.R.C. 1939, so that gain realized by petitioners upon the sale of stock therein in 1951 was ordinary income rather than capital gains; (2) if so, was the 10 per cent stock ownership limitation of section 117(m)(3)(A) applicable to petitioner Rose M. Jacobson, Docket No. 63483?

Decision on issues involving additions to tax for substantial underestimation will depend upon resolution of the "collapsible corporation" question.

### FINDINGS OF FACT.

The stipulated facts are so found and are included herein by reference.

Petitioners in Docket No. 63483, Lewis S. Jacobson and Rose M. Jacobson, his wife, residing in Woodbridge, New Jersey, filed a joint individual income tax return for the calendar year 1951, on the cash basis, with the collector of internal revenue for the fifth district of New Jersey.

Petitioners in Docket No. 63484, Joseph Facher and Rose Facher, his wife, residing in Maplewood, New Jersey, filed a joint individual income tax return for the calendar year 1951, on the cash basis, with the collector of internal revenue for the fifth district of New Jersey.

Petitioners in Docket No. 63485, William Schmitz and Ruth Schmitz, his wife, residing in Elizabeth, New Jersey, filed a joint individual income tax return for the calendar year 1951, on the cash basis, with the collector of internal revenue for the fifth district of New Jersey.

Petitioners in Docket No. 63486, Morris Winograd and Ida Winograd, his wife, residing in Jersey City, New Jersey, filed a joint individual income tax return for the calendar year 1951, on the cash basis, with the collector of internal revenue for the fifth district of New Jersey.

Petitioners in Docket No. 65629 are Joseph Facher, executor of the Estate of Morris Kanengiser, who died July 11, 1952, and Esther Weiner, Sidney Kanengiser, Marvin Kanengiser, and Irving Kanengiser, executors of the Estate of Fannie Kanengiser, who died October 10, 1957.

Morris Kanengiser and Fannie Kanengiser, his wife, filed a joint individual income tax return for the calendar year 1951, on the cash basis, with the collector of internal revenue for the fifth district of New Jersey.

During the taxable years and since 1919, Morris Winograd was and had been a general contractor and builder. Most of his building was done for others. Joseph Facher, Morris Kanengiser, Lewis

S. Jacobson, and William Schmitz had been partners and business associates with others over the years in the construction and operation of a number of skating rinks and the concessions connected with them. In addition, Jacobson was a lawyer actively engaged in the practice of his profession. Winograd had been engaged to construct some of the rinks for the partnership and they all were well acquainted. All of the group at one time or another and sometimes on a continuing basis had investments in income-producing real estate. The magnitude and exact nature of these investments, i.e., whether in corporate stock or loans; whether operated as partnership interests or in corporate form, cannot accurately be found from the record. The men were all experienced businessmen.

On or about November 29, 1948, Winograd purchased certain real estate in North Bergen Township, Hudson County, New Jersey, at public auction for $55,000. It was not income-producing property at the time of purchase. Facher and Kanengiser attended the sale with Winograd who had previously conceived a plan for building a housing project consisting of a number of apartment houses on the land. In addition to Facher and Kanengiser, Jacobson and Schmitz became interested in the project. After the purchase, the group engaged an architect to advise how many apartment houses could be built on the property and sought the advice of Federal Housing Administration officials as to what was best to build there.

On April 29, 1949, Jacobson, Facher, Schmitz, Winograd, and Kanengiser caused a corporation to be organized under the New Jersey laws known as Hudson Towers, Inc. Its articles of incorporation were filed on May 12, 1949. The articles, *inter alia*, provided that the corporate objects were to provide housing for rent or sale, to sell, convey, assign, mortgage, or lease property, to borrow money, to apply for and obtain from the Federal Housing Commissioner contracts of mortgage insurance under the National Housing Act covering notes etc. and any mortgage covering the same. It was additionally provided that the corporation would engage in no business other than the construction and operation of rental-housing projects so long as the corporation was encumbered by a deed of trust or mortgage insured by the Commissioner.

Hudson Towers, Inc., had authorized capital stock as follows:

> 100 shares preferred stock, par value $1 per share.
> 100 shares common stock, class A, no par value.
> 1,900 shares common stock, class B, no par value.

Common stock, class A, shares and common stock, class B, shares had identical rights in all respects except election of directors. Common stock, class A, was entitled to elect one director and common stock, class B, was entitled to elect two directors.

Stock was issued by Hudson Towers, Inc., and paid for as follows in or about May 1949:

| | | Shares |
|---|---|---|
| (a) Preferred stock: | | |
| 1. Federal Housing Administration | | $100 for 100 |
| (b) Common stock, Class A: | | |
| 1. Morris Winograd | | 3,500 for 70 |
| (c) Common stock, Class B: | | |
| 1. Rose M. Jacobson | | 750 for 15 |
| 2. Anne G. Wilson | | 750 for 15 |
| 3. Joseph Facher | | 2,000 for 40 |
| 4. Ruth Schmitz | | 100 for 2 |
| 5. William Schmitz | | 900 for 18 |
| 6. Morris Kanengiser | | 2,000 for 40 |
| Total A and B common | | 10,000 200 |

(Kanengiser and Facher were brothers-in-law.)

The taxpayers loaned the following amounts, evidenced by an agreement dated January 18, 1950, to Hudson Towers, Inc.:

| | |
|---|---|
| Morris Winograd | $84,000 |
| Joseph Facher | 48,000 |
| Morris Kanengiser | 48,000 |
| Lewis S. Jacobson | 36,000 |
| William Schmitz | 21,600 |
| Ruth Schmitz | 2,400 |
| Total | 240,000 |

The loans bore 6 per cent interest and were due January 1, 1953, with the right of ratable prepayment.

The officers of Hudson Towers, Inc., were Joseph Facher, president, Morris Winograd, secretary, and Morris Winograd, treasurer.

In an agreement dated May 31, 1949, Hudson Towers, Inc., purchased from Winograd his rights in the property which he had bought in North Bergen Township.

On January 25, 1949, J. I. Kislak, Inc., as proposed mortgagee, made application with the Federal Housing Administration pursuant to the provisions of sec. 608 of the National Housing Act, 12 U.S.C. sec. 1743 (1946 ed.), as amended, for mortgage insurance of a housing project to be constructed on the North Bergen Township property. The sponsors of the project were Winograd, Facher, and Kanengiser. The mortgage proposed was in the amount of $1,800,000.

On April 7, 1949, the Federal Housing Administration issued to J. I. Kislak, Inc., the commitment requested in his application but not to exceed $1,779,000.

On or about June 28, 1949, J. I. Kislak, Inc., assigned the said mortgage insurance commitment to the Hudson County National Bank.

On June 28, 1949, Hudson Towers, Inc., executed a building loan agreement with the Hudson County National Bank to secure a loan

of $1,779,000. Also on June 28, 1949, Hudson Towers, Inc., and Kay Construction Corp. (both owned substantially by the same stockholders) entered into an agreement under which Kay Construction Corp., as contractor, was to construct for Hudson Towers, Inc., five apartment buildings. Kay Construction Corp. was required to furnish all materials and perform all work in accordance with the specifications of a named architect.

The property on which the apartment houses were to be constructed was land filled in with material which had been removed in connection with construction of the Lincoln Tunnels. The fill contained much rocky material and was considered to have settled so that it would afford a good foundation for building. As an experienced builder Winograd was aware that there were special problems concerned with building on filled-in ground. However, he also was of the opinion that a properly constructed building could safely be erected on such land. Accordingly, he consulted and engaged proper technical assistance to safeguard and design the structures. An architect was engaged and the advice of the Federal Housing Administration was sought to determine the best method of construction. Special engineers were also employed to design the footings for the project. The foundations of the buildings were constructed in accordance with the advice of the engineers and the work met with the approval of the Federal Housing Administration inspectors who were in charge of supervising the construction.

During construction, features in addition to the original plans were added to the project—vestibules, separate entries with telephones, show brick entrances, extra waterproofing, and similar details. These extras entailed extra expense, added to the attractiveness of the apartments to prospective tenants and enhanced prospective sale prospects if any should develop.

Rental prices of the apartments were fixed by agreement with the Federal Housing Administration and the added features could not result in increased rentals except insofar as they might affect fuller occupancy.

As construction of each of the apartment buildings was completed, apartments therein were leased. Irving Facher, son of Joseph Facher, was in charge of rentals. After completion of the five 5-story buildings, the apartments were substantially all rented, there being only 5 or 6 vacancies out of a total of 215 apartments.

Construction of the project was completed on or before June 16, 1950.

Twice during July 1950, after construction had been completed, a real estate broker sought authority to sell the apartment houses. He was informed that the properties were not for sale.

None of the petitioners was in the business of buying or constructing and selling apartment buildings or any other kind of real estate.

Sometime between September 15 and October 1, 1950, Winograd's attention was called to a crack in one of the buildings. (The record does not disclose which.) The crack was of the extent of "about three or four bricks, and there were some minor ones in joints." He put a piece of Scotch tape on the crack. To Winograd, at an undisclosed later time "it seemed to me that the thing is opening up a little wider."

Winograd did not at first tell his associates of the crack. He contacted them some time after he saw it and recommended that they "sell the building." The others proposed that they buy out Winograd. Several days later Winograd mentioned the crack at a meeting of the shareholders. No one other than Winograd thoroughly examined the crack. Schmitz looked at it one night with Winograd and suggested they get an engineer's opinion. No person outside the group was ever informed of the crack. No expert advice was ever sought as to how dangerous the crack was or whether it could be corrected. Joseph Facher also saw the crack. He was not disturbed except for Winograd's statement that he thought it was dangerous. At a later meeting petitioners decided to sell and they authorized Jacobson to proceed with plans and negotiations to sell the project by entering into a contract for the sale of all the capital stock, owned by them, in Hudson Towers, Inc. This authorization was later formalized by a document dated November 1, 1950, which was about 3 or 4 weeks after the decision was made to sell which was in late September or October 1950. Schmitz acted with Jacobson in the sale negotiations. Salespeople had been trying for some time before the actual sale to get permission to sell Hudson Towers. It took a very short time until the deal to sell the stock in Hudson Towers, Inc., was consummated through C. B. Snyder Company, Jersey City, New Jersey. A salesman, Howard Siegel, handled the details.

No disclosure was made to Siegel or the eventual purchaser as to the crack in the wall of one of the buildings.

Earnings and net profits of Hudson Towers, Inc., prior to the sale of the stock were unknown to most of the stockholders.

Hudson Towers, Inc., paid no dividends on its capital stock during the calendar years 1949 and 1950; showed it had no earned surplus or undivided profits; paid no income taxes, and reported a net loss of $21,760.50 for 1949 and a net loss of $54,382.35 for 1950.

The assets of Hudson Towers, Inc., consisted of the five apartment buildings, the land, and some small personal property.

On November 14, 1950, Morris Winograd, Joseph Facher, Morris Kanengiser, William Schmitz, Ruth Schmitz, Rose M. Jacobson, and Anne G. Wilson, as sellers, by their agent and attorney, Lewis S.

Jacobson, entered into an agreement, designated as a "Stock Purchase Plan" with Samuel List of Perth Amboy, New Jersey, as buyer, whereby the sellers agreed to sell to the buyer all their rights and interest in the stock of Hudson Towers, Inc., consisting of 70 shares of common stock, class A, and 130 shares of common stock, class B.

In accordance with the terms of the stock purchase agreement of November 14, 1950, Morris Winograd, Joseph Facher, Morris Kanengiser, William Schmitz, Ruth Schmitz, Rose M. Jacobson, and Anne G. Wilson did transfer on February 28, 1951, their said stock in Hudson Towers, Inc., each receiving the following amounts:

| | |
|---|---|
| Morris Winograd | $62,562.68 |
| Joseph Facher | 35,750.09 |
| Morris Kanengiser | 35,750.09 |
| William Schmitz | 16,087.55 |
| Ruth Schmitz | 1,787.50 |
| Rose M. Jacobson | 13,406.28 |
| Anne G. Wilson | 13,406.28 |

Petitioners reported their gains as long-term capital gains on their 1951 returns as follows:

| | | Gross sales price | Cost or other basis | Long-term capital gain |
|---|---|---|---|---|
| (a) | Morris and Ida Winograd | $62,562.68 | $3,500 | $59,062.68 |
| (b) | Joseph and Rose Facher | 35,750.09 | 2,000 | 33,750.09 |
| (c) | Morris and Fannie Kanengiser | 35,750.09 | 2,000 | 33,750.09 |
| (d) | William Schmitz and | 16,087.55 | 900 | 15,187.55 |
| | Ruth Schmitz | 1,787.50 | 100 | 1,687.50 |
| (e) | Lewis S. and Rose M. Jacobson | 13,406.28 | 750 | 12,656.28 |

In each case the Commissioner determined that the gain should have been reported as ordinary income within the purview of section 117(m), I.R.C. 1939.

Some of the stockholders of Hudson Towers recognized either the possibility that profit could be realized from the sale of the Hudson Towers project, or that there was the possibility of gain on the sale of the stock, or had an intent to make a profit from the sale of the stock.

### OPINION.

This case involves the now familiar question of whether a corporation formed to construct a housing project under the provisions of section 608 of the National Housing Act was a "collapsible" corporation so that gains upon the sale of their stock in the corporation are taxable to the selling shareholders pursuant to section 117(m) of the Internal Revenue Code of 1939 as though the gains were attributable to property which is not a capital asset.

The Commissioner's determination that the petitioners should have reported their gains from the sale of their stock in Hudson Towers, Inc., as ordinary income within the purview of section 117(m) is

presumptively correct and the burden is on the petitioners to show error in the Commissioner's action.

Ordinarily a corporation will be considered collapsible when its activity is principally construction and the construction is followed by the shareholders' sale of their stock before the corporation realizes a substantial part of the income to be derived from the construction and the shareholders realize gain attributable to the constructed property. *Carl B. Rechner*, 30 T.C. 186.

Petitioners concede that the corporation was formed or availed of for the construction of property, but they contend that this was not done with the requisite statutory "view" to a sale of their stock. They maintain that the "required view * * * must exist not later than the time of completion of construction," here stipulated to be June 16, 1950. Petitioners cite and rely on the following portion of the regulations:

A corporation is formed or availed of with a view to the action described in Section 117(m)(2)(A), *if the requisite view existed at any time during the manufacture, production, construction . . . referred to in that section.* Thus, *if the sale,* exchange, or distribution *is attributable solely to circumstances which arose after* the manufacture, *construction,* production, . . . (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production. . . .), *the corporation shall,* in the absence of compelling facts to the contrary, *be considered not to have been so formed or availed of.* However, if the sale, exchange, or distribution is attributable to circumstances present at the time of the manufacture, construction, production . . , the corporation shall in the absence of compelling facts to the contrary, be considered to have been so formed or availed of. U.S. Treas. Reg. 29.117–11(b). [Emphasis supplied by petitioners.]

The primary contention of petitioners is that they formed Hudson Towers, Inc., with the sole intention of providing for them a long-term investment and that the sale of their stock "resulted solely from the discovery in September or October of 1950 of a previously unknown and unanticipated defect in one of the apartment buildings, which made the taxpayers fearful of the future security of their investment." Thus, they argue, since construction of the apartment house project was completed by June 16, 1950, the sale of the stock resulted from a "post construction" motive which rendered section 117(m) as construed by the cited regulations, inapplicable. But see footnote 2, *Max Mintz*, 32 T.C. 723.

To support their contention they must rely almost wholly on the self-serving testimony of Winograd, Jacobson, Facher, and Schmitz, all of whom are petitioners. (None of the minute books, corporate correspondence, or books of Hudson Towers, Inc., were put in evidence.) Their testimony about the discovery of the crack in one building out of five being the sole motive for the stock sale is unconvincing and we can give it no weight. Without the "crack" motive established, we find nothing in the post-construction history of the

project which would demonstrate error in the Commissioner's determination. Winograd had had long experience in the construction business. He testified that sometime between September 15 and October 1, 1950, his attention was called to a crack in the brickwork on one of the buildings—"about three or four bricks, and then there were some minor ones in the joints * * * the main crack was in the center of the brick and this is what scared me more than anything else because I could not fix it." Parenthetically, he never tried to fix it. He applied a "primitive" or "telltale" test which consisted of placing a piece of Scotch tape over the crack "and watch what happened." Then, after an undisclosed lapse of time, "It seems to me that the thing is opening up a little wider." Thereupon Winograd says he made up his mind to get out of the project and recommended to the group that they sell, too. He did not mention the crack to them. The further testimony is that the other stockholders did not at first want to sell, but, instead, proposed to Winograd that he sell to them. After this proposal was made, Winograd took Schmitz, who knew little about construction, to show him the crack. When Winograd showed it to him and he saw "how frightened" Winograd was, Schmitz testified he also "got scared" and decided to sell. At another time Facher was shown the crack. Facher testified he told Winograd at the time, "Well, I saw cracks in buildings if I could remember right, maybe seven or eight bricks and nothing dangerous." Winograd answered, "I am afraid because this land is filled in," and, "I advise we should sell it." So, or as the testimony goes, all the shareholders decided to sell their stock in reliance on Winograd's fears. And this without consulting any architects or engineers or other experts about the cause of the crack, its dangerousness, or the possibility of correcting the fault and thus saving for the group a $1,800,000 five-apartment-building project that had variously been described by them as a project entered into "to build them and rent them and derive income as an investment for the future"—Winograd; "this proposition when originally presented was for a long term, a long time investment"—Jacobson, who acted for his wife, Rose; "for investment purposes to derive the benefit out of it for renting and managing"—Facher; "to build it up and operate it for investment for my old age"—Schmitz.

We cannot square this testimony about the avowed purpose for which the shareholders put their money into the stock of Hudson Towers, Inc., with the fact that they actually sold all of their stock within 3 or 4 months after the project was completed and prior to the realization by the corporation of a substantial part of the net income to be derived from the project. If the initial intent of long-term investment was as strong and persistent as petitioners contend,

we think it is unlikely and improbable that it gave way to fears arising from what appears to have been an insubstantial crack in one of the five apartment houses.

It is much more likely that at least some of the shareholders anticipated right along the possibility of making a profit from the sale of their stock before the corporation had realized any substantial net income. It is difficult from the record to pinpoint exactly when this recognition or anticipation came into being but we think it could just as well have been prior to or during construction as not. There was testimony from some petitioners to the effect that the possibility of profit from the sale of the project was recognized, or that there was the possibility of gain on the sale of the stock, or an intent to make a profit from such a sale. This testimony was equivocal as to when the recognition of the possibility or the intent to make a profit arose—but it was up to the petitioners to prove that it arose "post construction" and we do not think they have done so. Of one thing we are certain, had there been no profit, there would have been no sale of the stock, despite professed fear for the safety of one of the buildings, which, so far as the record shows, was still standing at the time this case was tried.

In short, petitioners have not carried their burden of proving that section 117(m) was inapplicable to Hudson Towers, Inc.

Our view of the record gives petitioners the benefit of a regulation which may be unduly favorable to them. See *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2), affirming a Memorandum Opinion of this Court; *Burge* v. *Commissioner*, 253 F. 2d 765 (C.A. 4), affirming 28 T.C. 246; and *Rose Sidney*, 30 T.C. 1155. Those cases indicate that the "view" requisite to bring section 117(m) into play need only exist at the time the corporation is availed of and the corporation may be availed of at any time during its corporate life. Here we have no doubt but that the required view was present when the stock sale was made.

Petitioners also make the argument that section 117(m) was only intended to prevent the conversion of income taxable at ordinary rates to long-term capital gain and that what the Commissioner is attempting to do here is to use the section to convert income which would otherwise be taxable as capital gain into ordinary income. The explicit language of section 117(m)(1) forecloses this argument. It plainly provides that "[g]ain from the sale * * * of stock of a collapsible corporation, to the extent that it would be considered * * * as gain from the sale * * * of a capital asset held for more than 6 months, shall * * * be considered as gain from the sale * * * of property which is not a capital asset." The Commissioner is here attempting to do no more than the statute plainly requires.

We sustain the Commissioner on the collapsible corporation issue.

With reference to petitioners Lewis and Rose Jacobson, it is contended that the provisions of section 117(m) are inapplicable by reason of the limitation in section 117(m)(3)(A), which provides as follows:

(3) LIMITATIONS OF APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, * * * such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

\*      \*      \*      \*      \*      \*      \*

For purposes of subparagraph (A), the ownership of stock shall be determined in accordance with the rules prescribed by paragraphs (1), (2), (3), (5), and (6) of section 503(a), except that, in addition to the persons prescribed by paragraph (2) of that section, the family of an individual shall include the spouses of that individual's brothers and sisters (whether by the whole or half blood) and the spouses of that individual's lineal descendants.

Rose actually owned 7½ per cent in value of the outstanding stock in Hudson Towers, Inc. Lewis actually owned no stock. He was, however, a partner of others who actually owned more than the required 10 per cent of the stock. In other words, while not an actual stockholder, Lewis was a constructive stockholder of more than 10 per cent of the stock because the shares owned by his partners are considered to be owned by him. Petitioners argue that the stock thus "considered" to be owned by Lewis, who was not an actual shareholder, cannot again be considered as being owned by Rose. They point to section 503(a)(5) which apparently precludes double attribution of constructively owned shares. However, we think that section 117(m)(3)(A)(ii) overrides the prohibition against attributing ownership twice. As we interpret that section Rose owned her own stock as well as the stock which Lewis was considered as owning, i.e., the stock of his partners. Petitioners would read section 117(m)(3)(A)(ii) as applying only to stock of actual shareholders, but we think it applies to constructive as well as actual shareholders. It speaks of shareholders either as those who owned stock or were considered as owning stock. It is not confined to actual owners of shares. The limitation of section 117(m)(3)(A) is not applicable to Rose, and section 117(m) applies to her.

The question of the propriety of the additions to tax for substantial underestimations of estimated tax in Dockets No. 63484 and No. 65629 is not argued by petitioners. It is decided against them.

*Decisions will be entered for the respondent.*