SYLVESTER J. LOWERY AND ROSEMARY P. LOWERY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69978.   Filed March 21, 1963.

*Joseph F. McVeigh, Esq.,* for the petitioners.
*Edward L. Newberger, Esq.,* for the respondent.

### OPINION.

BRUCE, *Judge:* The respondent determined deficiencies in income tax, and additions to tax under section 291(a), I.R.C. 1939, for failure to file a timely return, and under section 294(d)(2) for substantial underestimate of tax, as follows:

| Year | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 291(a) | Sec. 294(d)(2) |
| 1951 | $8,186.26 | $2,046.57 | |
| 1952 | 95,400.68 | 4,770.04 | $9,022.16 |

The principal issue for decision is whether gains realized by Sylvester J. Lowery from certain sales of stock are taxable as ordinary income pursuant to section 117(m), I.R.C. 1939, relating to collapsible corporations. The additions to tax are also contested. The facts are stipulated and found accordingly.

The petitioners, husband and wife, reside in Merion, Pa. They filed joint income tax returns for 1951 and 1952 with the director of internal revenue at Philadelphia. Both returns were filed on June 22, 1953. An extension had previously been granted to June 15, 1953, for filing the return for 1952.

In the returns Sylvester J. Lowery, hereinafter referred to as petitioner, listed his occupation as "Builder and Mfgr." and his principal business activity as "Builder."

In all of the projects in which petitioner engaged during the years in question, one of his associates was E. J. Frankel, a builder of many years' experience in the Philadelphia area. Frankel's activities in building involved the supervision of the actual construction phase of each of the following projects.

### Parkway House, Inc.

Parkway House, Inc., hereinafter referred to as Parkway, was organized under the laws of Pennsylvania on January 23, 1950. It was formed for the purpose of constructing and operating a luxury apartment house at 2201 Parkway, Philadelphia, Pa.

Parkway had an authorized capital of 250 shares of common stock, each share having a par value of $10. The total capital was, therefore, $2,500.

E. J. Frankel was instrumental in organizing Parkway. Petitioner had no connection with the organization of this corporation. Petitioner, E. J. Frankel, and others in 1949 had engaged in a building project in Collingswood, N.J., known as Park View Apartments. Petitioner had arranged for the Federal Housing Administration commitment, and Frankel had supervised the actual construction. Because of the success of this project, in which petitioner had brought in Frankel, Frankel permitted the petitioner to participate in Parkway.

The petitioner acquired a 30-percent interest (75 shares), for which he paid $750. The shares were issued to petitioner on October 18, 1950.

Parkway was not an FHA project, but was initially financed by means of a conventional mortgage. Petitioner's special ability and knowledge with respect to FHA mortgages was not required in this project.

After the actual construction phase of the project was approximately 50 percent completed, Frankel determined that certain improvements to the building were desirable, including complete air

conditioning. He advised petitioner that the project would cost approximately $700,000 more than the invested capital and the mortgage proceeds, which would require additional investment on the part of the shareholders. Petitioner was not in a position to advance additional funds, nor did he desire to do so. Frankel thereupon informed petitioner that the additional funds were urgently needed, and that he had contacted two people who were willing to advance a portion of these funds on the condition that they obtain an equity interest in the corporation. Petitioner thereupon sold his 75 shares on August 29, 1951, for $45,000. At this time the project was about 50 percent completed.

On his 1951 income tax return the petitioner reported a long-term capital gain of $44,250 on the sale of Parkway stock. The respondent determined that this gain was taxable as ordinary income.

At the time of the sale of the stock by petitioner, Parkway had not realized any income. At the time of the sale, the construction of the apartment house at 2201 Parkway was the sole activity of Parkway.

E. J. Frankel did not dispose of his interest in Parkway.

### Raleigh Construction Company.

Raleigh Construction Co., hereinafter referred to as Raleigh, was incorporated under the laws of New Jersey on February 27, 1950, with an authorized capital of 100 shares of common stock having no par value. The construction of Warwick Apartments, luxury apartment houses, was the principal activity of Raleigh.

All of the shares of Raleigh were issued for $10 per share, giving the corporation a total capital of $1,000.

The shares of Raleigh were issued as follows:

| Shareholder | No. of Shares | Per-cent |
|---|---|---|
| S. J. Lowery | 40 | 40 |
| E. J. Frankel | 40 | 40 |
| Frank Steinberg | 13 | 13 |
| Nate Margolin | 7 | 7 |

At the same time that Raleigh was incorporated, the shareholders organized another corporation known as Raleigh, Inc., which corporation owned the project (Warwick Apartments). All of the stock of Raleigh, Inc., was owned by Raleigh.

Petitioner undertook and was successful in obtaining a commitment from the FHA to insure mortgage loans on the above project. The FHA commitment for mortgage loan insurance obtained by the petitioner was issued to Raleigh, Inc.

To finance the construction, Raleigh received construction loans totalling $2,489,000 from the Irving Trust Co. of New York.

As a condition for advancing this sum, Irving Trust Co. required the shareholders to execute an FHA indemnity agreement under which

all parties thereto assumed joint and several liability to the extent of approximately $235,000 to insure compliance with the requirements of the building loan agreement entered into between the Irving Trust Co. and Raleigh, Inc., covering the construction of the project.

Construction of the above project was begun in the early part of 1950.

The above project was substantially completed in July 1951, at a cost of about $2,755,274. The excess of cost over construction loans and invested capital was approximately $265,374.

Frankel advised the shareholders that additional funds were required because of the excess of cost. The corporation endeavored to obtain the additional funds by applying for bank loans, but was able to obtain a loan of only $100,000 from the Boardwalk National Bank of Atlantic City, which sum was used to pay subcontractors.

In connection with the above loan the shareholders were obliged to assume personal liability and to endorse the note given to the bank as security for the loan.

The petitioner was unable to advance additional funds and so advised Frankel.

Sometime in August of 1951 Frankel advised the petitioner that he knew an individual who would be willing to advance the corporation sufficient funds to pay the outstanding liabilities, provided he receive a substantial interest in Raleigh.

The individual who was interested in acquiring an interest in the corporation was Morris Hassel. Petitioner thereupon met with Hassel, Frankel, and Steinberg to discuss the matter. It was determined that the amount which petitioner should receive for his shares would be $151,500, to which petitioner agreed.

All of the parties in interest entered into an agreement on October 23, 1951, the purpose of which was to give Frankel and Hassel each a 43-percent interest and Steinberg a 14-percent interest (nonvoting) in Raleigh. Hassel thereupon advanced $360,000 to the corporation and received the corporation's note as security for the loan.

The petitioner had borrowed $140,000 at 4-percent interest from Raleigh on October 23, 1951. The loan was payable on or before February 1, 1952. The security for the loan was the petitioner's 40 shares of stock. On January 31, 1952, the petitioner agreed to sell his 40 shares of stock to the company for $151,500, as noted above. The amount owed by him to the company, as of that date, including accrued interest of $1,518.83, was $141,518.83. The company paid the petitioner the difference of $9,981.17. The company further agreed to indemnify the petitioner in case of any loss by reason of his endorsement of the note to the Boardwalk National Bank and the execution of the indemnity agreement in favor of the Irving Trust Co.

At the time the project was substantially completed in July 1951, leases had been executed by tenants calling for the payment of rentals totaling in excess of $900,000 in the ensuing 2 years, in addition to which the sum of approximately $40,000 had been received for use of the swimming pool facilities which were a part of the project.

There was a long waiting list of applicants for apartments in the project.

The petitioner reported a long-term capital gain of $149,981.17 on the sale of the stock in Raleigh in his 1952 return. On the return the petitioner used the caption "Raleigh (Warwick Apts.)" but meant by this Raleigh Construction Co. The respondent determined that the profit was taxable as ordinary income and that the amount of this income was $151,500. The difference of $1,518.83 represents the accrued interest, and the respondent has allowed this as a separate deduction for interest paid.

At the time of the sale of stock by petitioner, Raleigh and Raleigh, Inc., had realized gross income of approximately $300,000, of which more than $250,000 represented rental income from apartment leases, although the combined income tax return of the two corporations indicated a loss slightly in excess of $100,000, more than $80,000 of which was attributable to depreciation.

E. J. Frankel retained his interest in Raleigh for more than 3 years.

### Duval Construction Co.

Duval Construction Co., hereinafter referred to as Duval, was organized under the laws of Pennsylvania on July 26, 1950. The construction of Johnson Manor Apartments was the sole activity of Duval.

Four shares of the stock were issued, of which the petitioner acquired nine-tenths of one share, or 22½ percent of the outstanding shares. The remaining shares were issued to four other individuals, one of whom was Frankel.

Petitioner secured a commitment from the FHA, and Frankel supervised the construction of Johnson Manor Apartments.

At the time Duval was incorporated, the shareholders organized another corporation known as Johnson Manor, Inc., which corporation owned the project (Johnson Manor Apartments). All of the stock of Johnson Manor, Inc., was owned by Duval.

During the course of construction it became apparent that costs would exceed the available mortgage funds plus the invested capital. The shareholders decided to sell out, and sold their shares for $62,542, petitioner's share of this being $14,072.

The petitioner, on his 1952 income tax return, reported a long-term capital gain of $14,072 on the sale of his stock in Duval. On the

return the petitioner used the caption "Johnson Manor" but meant by this Duval Construction Co. The respondent determined that the profit was taxable as ordinary income.

The petitioner sold his stock in Duval prior to the realization by the company of any income to be derived from the project.

### Carver Construction Co.

Carver Hall, Inc., was a New Jersey corporation incorporated on February 8, 1950. The entire outstanding and issued common stock of the corporation, having no par value, consisted of 2,050.19 shares, all of which were owned by Carver Construction Co., hereinafter referred to as Carver, a New Jersey corporation organized in 1950. The sole activity of Carver was the construction of 250 apartment units.

Petitioner and Frankel, Steinberg, and Margolin, who were the owners of the stock of Raleigh, were also the owners of Carver in approximately the same relative proportions.

This project was handled concurrently with the Warwick Apartments and was done largely at the request of the FHA. The apartments were to provide housing for colored people. Petitioner secured the FHA commitment and Frankel supervised the construction.

The shareholders never had any strong desire to build this project and did so only at the insistence of the FHA. Before construction was completed the shareholders determined to dispose of their shares and did so in 1952. Petitioner did not report any gain on the sale in his 1952 return.

The petitioner had a gain of $5,142.70 on the sale of his stock in Carver. He sold his stock prior to the realization by the corporation of any income to be derived from the project.

Petitioner reported the gain derived by him from the sale of his stock in each of the four corporations as long-term capital gain. Respondent determined that the gain realized by petitioner upon the sale of his stock in each of these corporations was taxable as ordinary income under the provisions of section 117(m) of the Internal Revenue Code of 1939. The principal question for our determination is whether each of the corporations in question was a collapsible corporation within the meaning of section 117(m).

Section 117(m), the pertinent portions of which are set forth below,[1] provides that gain from the sale of stock of a collapsible corporation,

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

to the extent that it would be considered (but for the provisions of this section) as gain from the sale of a capital asset held for more than 6 months, shall, with certain exceptions not here applicable, be considered as gain from the sale of property which is not a capital asset. As applicable to the construction industry, a collapsible corporation is defined in section 117 (m) (2) (A) as one formed or availed of principally for the construction of property with a view to the sale of stock by the shareholders prior to the realization by the corporation of a substantial part of the net income to be derived from such property, and the realization by such shareholders of gain attributable to such property.

Petitioner contends that none of the corporations in question was formed or availed of "with the view" to the sale of stock by its shareholders, prior to the realization of a substantial part of the net income to be derived from the property by the corporations. Respondent contends that such "view" was present with respect to each of the corporations.

Petitioner further argues that being a minority stockholder he was compelled to sell his stock by reason of the circumstances set forth in the stipulation of facts and accordingly section 117 (m) has no application to any of the sales made by him. Furthermore, with respect

---

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

\* \* \* \* \* \* \*

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation.—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, or at the time of the purchase of the property described in subsection (a)(1)(A) or at any time thereafter, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning more than 10 per centum in value of the outstanding stock of the corporation ;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased : and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, production, or purchase.

For purposes of subparagraph (A), the ownership of stock shall be determined in accordance with the rules prescribed by paragraphs (1), (2), (3), (5), and (6) of section 503(a), except that, in addition to the persons prescribed by paragraph (2) of that section, the family of an individual shall include the spouses of that individual's brothers and sisters (whether by the whole or half blood) and the spouses of that individual's lineal descendants.

to the Raleigh Corp., petitioner contends that, if it existed at all, the requisite "view" did not exist at any time during construction of the project or prior to the realization by the corporation of substantial income from the project.

Section 29.117–11(b) of Regulations 111 (1953–1 C.B. 187, 190), applicable to the taxable year 1951,[2] provides, in part, as follows:

> A corporation is formed or availed of with a view to the action described in section 117(m) (2) (A) if the requisite view existed at any time during the * * * construction * * * referred to in that section. Thus, if the sale * * * is attributable solely to circumstances which arose after the * * * construction * * * (other than circumstances which reasonably could be anticipated at the time of such * * * construction * * * ), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale * * * is attributable to circumstances present at the time of the * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

The question as to what constitutes a collapsible corporation has been before this and other courts in numerous cases. In a number of cases involving corporations used in the construction of apartment buildings, housing developments, or shopping centers, it has been held that where the stockholders decide, prior to the completion of construction, and prior to the realization of a substantial part of the net income to be derived from the property, to sell their stock to other persons, the corporation is collapsible. See *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2, 1958), affirming a Memorandum Opinion of this Court; *Burge* v. *Commissioner*, 253 F. 2d 765 (C.A. 4, 1958), affirming 28 T.C. 247; *Edward Weil*, 28 T.C. 809, affd. 252 F. 2d 805 (C.A. 2, 1958) ; *Ellsworth J. Sterner*, 32 T.C. 1144 (1959) ; and *Benjamin Braunstein*, 36 T.C. 22, affd. 305 F. 2d 949, certiorari granted 371 U.S. 933. In each of those cases it was held that the corporations were "availed of * * * with a view to" the action described in section 117(m) (2) (A).

It is clear from the facts stipulated that petitioner realized gains upon the sale of his stock in both the Carver and Duval corporations, that in each case such gains were attributable to property constructed by the corporation as its principal and sole activity, and that in each case the sale took place during construction and prior to the time the corporation had realized any income from the project. It also appears that at the same time petitioner sold his stock in each of these two corporations, and as a part of the same transactions, all the other stockholders sold their stock. These facts are practically indistin-

---

[2] For taxable years beginning after December 31, 1951, see sec. 39.117(m)–1(b), Regs. 118.

guishable from those involved in the cases cited above. Accordingly, it is our opinion, and we so hold, that both Carver and Duval were collapsible corporations within the meaning of section 117(m) and the gain derived by petitioner from the sale of his stock therein is in each instance taxable as ordinary income.

Insofar as these two corporations are concerned, we find no merit in petitioner's argument that because he was a minority stockholder section 117(m) has no application to the stock sales made by him. Since he owned more than 10 percent of the stock in each, it is apparent petitioner does not come within the specific statutory exemption provided by section 117(m)(3)(A). Referring to the requirement under section 117(m)(2)(A) that, to be collapsible, a corporation must be formed or availed of with a view to the action therein described, section 29.117–11(b) of Regulations 111, previously referred to herein, provides:

> This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated unconditionally, conditionally, or as a recognized possibility. If the corporation was so formed or availed of, it is immaterial * * * if a shareholder at such time, did not share in such view, and any gain of such shareholder on his stock in the corporation shall be treated in the same manner as gain of a shareholder who did share in such view.

In the case of both Carver and Duval there was a sale of *all* of the stock by *all* of the shareholders and it is clear that petitioner, in fact, shared in the view of the majority of the shareholders to sell the stock prior to the realization by the corporations of any part of the net income to be derived from the property.

A different conclusion is required with respect to the Parkway and Raleigh corporations than that which we have determined with respect to the Carver and Duval corporations.

Parkway was organized in January 1950 by E. J. Frankel, an experienced builder, for the purpose of constructing and operating a luxury-type apartment. Petitioner was permitted by Frankel to acquire a 30-percent interest (75 shares) in October 1950. Initial financing was by means of a conventional mortgage. After construction of the buildings was approximately 50 percent completed, Frankel determined certain improvements were desirable, including air conditioning, which would cost approximately $700,000 more than the invested capital and mortgage proceeds and which would require additional investment on the part of the shareholders. Petitioner was unable to advance additional funds. Frankel thereupon advised petitioner he had contacted two other persons willing to advance a por-

tion of the needed funds on condition they obtain an equity interest in the corporation. Petitioner thereupon sold his 75 shares in August 1951, at which time construction of the apartment buildings was only about 50 percent completed and the corporation had received no income from such construction.

Raleigh was incorporated in February 1950, also for the purpose of constructing luxury-type apartments. Petitioner acquired a 40-percent interest (40 shares) of the common stock. A mortgage insurance commitment was obtained from FHA and construction loans were obtained from a bank. Construction of the project was "substantially completed" in July 1951 at a cost of approximately $265,374 in excess of construction loans and invested capital. The corporation endeavored to borrow the additional funds needed but was able to borrow only $100,000 from another bank upon the shareholders assuming personal liability and endorsing the note given as security. This left approximately $165,374 to be furnished by the shareholders, of which petitioner's pro rata share was $66,149.60. Petitioner was unable to advance additional funds and so advised Frankel. Thereafter, Frankel advised petitioner another person, Morris Hassel, was willing to advance the corporation funds sufficient to meet its obligations provided he receive a substantial interest in the corporation. An agreement was entered into in October 1951, providing that Hassel should receive a 43-percent interest and the value of petitioner's shares was fixed at $151,500. Hassel loaned the corporation $360,000 and thereafter, on January 31, 1952, petitioner sold his 40 shares to the corporation.

It is clear from the facts stipulated that both Parkway and Raleigh were corporations "availed of," used or employed, principally for the construction of apartment buildings and that upon the sale of his stock in each of these corporations petitioner realized gain which was attributable to such construction. At the time petitioner sold his stock in Parkway, construction had not been completed and the corporation had not realized any income from such construction. At the time petitioner sold his stock in Raleigh, construction had been substantially completed, its apartments were under lease and it had received approximately $300,000 in income from rentals of its apartments and the use of the swimming pool which was a part of the project.

Thus, in many respects, the transactions which took place with respect to Parkway and Raleigh are similar to those which occurred with respect to Carver and Duval. One material distinction exists, however. In both Parkway and Raleigh, those owning the majority of the stock and who were not only in a position to, but did, in fact, control their policies, did not sell their stock but continued to operate

the corporations. Neither corporation was availed of "with a view to" the action described in section 117(m)(2)(A), by those owning a majority of the stock and controlling its policies. It necessarily follows that petitioner did not "share" in such a view. Neither corporation was "collapsible" or was ever in fact collapsed. The situation here presented is distinguishable from those cases in which corporations have been held collapsible even though the corporation as such continued in existence since, in those cases, all shareholders sold their stock with a view, shared by all, to the realization of gain prior to the realization by the corporation of a substantial part of the net income to be derived from the property constructed. Cf. *Burge* v. *Commissioner*, *supra*; *Glickman* v. *Commissioner*, *supra*.

Section 117(m) was originally added to the Internal Revenue Code of 1939 by section 212 of the Revenue Act of 1950. As the congressional reports [3] indicate, the purpose of this enactment was to curb certain practices which had arisen in the motion-picture industry and in the building construction trade whereby ordinary income was being converted into long-term capital gains, taxable only at a rate of 25 percent, by use of a temporary corporation. Similar results could be reached by the shareholders selling their stock to outside interests or by the corporations distributing the property without liquidating.

In the motion picture field the practice generally involved the formation of a corporation by the interested parties, usually including writers, actors, producers, and directors, to produce a motion picture. After the film was completed, but before any income was derived therefrom, the corporation was liquidated or "collapsed" and the assets distributed. The corporation paid no tax, claiming it had realized no income. The shareholders paid a tax upon the difference between their cost for the stock and the fair market value of the assets distributed, at long-term capital gain rates. After liquidation, the fair market value of the released production was amortized and only the excess of income received on distribution of the film over the fair market value of the film was taxed as ordinary income. See *Pat O'Brien*, 25 T.C. 376.

In the building construction field contractors formed a corporation to construct buildings and then liquidated or "collapsed" the corporation before any income was realized from the property constructed. A capital gains tax was paid by the shareholders on the excess of the value of the assets distributed over the cost of the stock. See *Frank E. Gilman*, 14 T.C. 833. See also *George M. Gross*, 23 T.C. 756, affd. 236 F. 2d 612 (C.A. 2, 1956), which involved the distribution of the excess of FHA loan funds over actual cost.

[3] H. Rept. No. 2319, 81st Cong., 2d Sess., p. 56, 1950–2 C.B. 422–423 ; S. Rept. No. 2375, 81st Cong., 2d Sess., p. 45, 88–91, 1950–2 C.B. 516, 546–547.

In our opinion section 117(m) was not intended to apply where, as here, a minority shareholder is compelled, because of circumstances over which he had no control, to dispose of his investment in a corporation which is thereafter continued in operation by the majority shareholders. The legislative history does not indicate it was so intended and we are aware of no case which has held otherwise. Accordingly, it is our opinion, and we so hold, that neither Parkway nor Raleigh was a collapsible corporation within the meaning of section 117(m) and that the gain derived by petitioner from the sale of his stock in each of these corporations did not constitute ordinary income but was capital gain.

In view of our disposition of the issue relating to the sale of his stock in Parkway and Raleigh, as a minority shareholder, it is unnecessary for us to determine whether, aside from his being a minority shareholder, at the time petitioner sold such stock, he did so "with a view to" the action proscribed by section 117(m)(2)(A). See *Maxwell Temkin*, 35 T.C. 906 (1961); *Charles J. Riley*, 35 T.C. 848 (1961); and *Jacobson* v. *Commissioner*, 281 F. 2d 703 (C.A. 3, 1960), reversing 32 T.C. 893.

It is also unnecessary for us to make any determination with respect to petitioner's further argument that at the time he sold his stock in Raleigh the project was "completed" and the corporation had realized a substantial part of the income to be derived from such property. See *Edward Weil, supra.*

The remaining issues relate to the additions to tax determined by respondent under the provisions of section 291(a), I.R.C. 1939, for failure to file timely returns for 1951 and 1952, and section 294(d)(2), I.R.C. 1939, for substantial underestimate of tax for the year 1952.

Petitioners' return for 1951 was filed more than a year late and the return for 1952 was filed on June 22, 1953, after an extension to June 15, 1953, had expired. The delinquency is not explained and no reasonable cause therefor is shown, nor is the liability for additions to tax for failure to file timely returns discussed on brief. We hold petitioners are liable for the additions to tax imposed by section 291(a) for each of the years 1951 and 1952, the amounts thereof to be computed under Rule 50.

The petitioners argue that the addition to tax imposed by section 294(d)(2) should not be imposed where the estimate is an honest one, and they also point out that such a penalty was eliminated by Congress in the 1954 Code. The addition to tax imposed by section 294(d)(2) is mandatory and is not to be excused by a showing of reasonable cause. Also, Congress did not see fit to amend or eliminate this provision in the 1939 Code, which is applicable here. We hold

that petitioners are liable for the addition to tax imposed by section 294(d)(2) for the year 1952, the amount thereof to be computed under Rule 50.

Other issues have been settled by stipulation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.:* The Court's opinion seems to me painted with much too broad a brush. The fact that "neither corporation was availed of 'with a view to' the action described in section 117(m)(2)(A), by those owning a majority of the stock and controlling its policies" does not "necessarily" lead to the conclusion that the corporation was not availed of by this petitioner with the requisite "view." Since the sale of stock is an individual matter, the "view" of other shareholders can have only evidentiary bearing on what was in petitioner's mind.

Petitioner was, in his own words, a "builder" by occupation. Had he entered upon a proposed project and sold it even before completion as a sole proprietor, it would have resulted in ordinary income [1] to him. *D. L. Phillips*, 24 T.C. 435 (1955). This petitioner, as far as his participation went, accomplished the same result through a corporation. But prior to the enactment of section 117(m), I.R.C. 1939, the sale of his stock would have resulted in capital gain. *Pat O'Brien* 25 T.C. 376 (1955). This, however, is the very mischief which section 117(m) was designed to remedy.[2] That petitioner was merely one stockholder without exclusive control [3] scarcely seems sufficient to cause a different result under section 117(m).[4]

[1] Actually, petitioner's personal services must have contributed substantially to Raleigh's profitable operation.

[2] "The collapsible corporation is a device which has been used in an attempt to convert ordinary income into long-term capital gain by use of a temporary corporation. * * *

"* * * it is understood that the collapsible-corporation device has also been used in the building-construction trade by contractors who have corporations construct buildings for sale and then liquidate the corporations and sell the buildings as individuals.

\*             \*             \*             \*             \*             \*             \*

"While the primary use made of collapsible corporations in the past has usually involved their liquidation in the manner indicated above, it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests at the time and under the circumstances when the corporation might otherwise be liquidated. * * * both paragraph (1) and paragraph (2) of the subsection refer to the sale or exchange of the stock other than in liquidation." H. Rept. No. 2319, 81st Cong., 2d Sess., pp. 56, 57, 97 (1950), 1950–2 C.B. 422–423, 450.

[3] Even the factual basis for concluding that petitioner was not a controlling stockholder is questionable as to Raleigh. He and Steinberg, between them, owned 53 percent of the voting stock, and with Margolin added, the total was 60 percent. In the transaction in question, petitioner and Margolin apparently disposed of their entire interest, and Steinberg of his voting stock. If 60 percent of voting stock is not "control," it is difficult to envisage what the word contemplates.

[4] "The collapsible corporation is a device whereby *one or more individuals* attempt to convert the profits *from their participation* in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent." (Emphasis added.) H. Rept. No. 2319, 81st Cong., 2d Sess., p. 96 (1950), 1950–2 C.B. 449.

While the sale of a partner's interest in a partnership possessing earned but uncollected income was not covered by legislation in 1952, it would be surprising if, in enacting section 117(m), Congress could have intended one of two majority stockholders to secure the benefits of prior law merely because his associate chose not to sell at the same time; particularly when at the next session the corresponding partnership provision, section 751, I.R.C. 1954, was expressly applied to the sale by any partner,[5] and section 117(m) was reenacted without significant change.

This intention of Congress might, of course, fail for want of adequate language. But, here, what petitioner did falls squarely within the wording of the section under consideration:

[The corporations were] availed of principally for * * * construction * * * with a view [by petitioner] to (i) the sale * * * of stock * * * prior to the realization by the corporation of a substantial part of the net income to be derived from such property, and (ii) [there was] realization by [petitioner] of gain attributable to such property.

Both its purpose and its language, hence, seem to require application of the section.

The opinion appears to recognize that such cases as *Maxwell Temkin*, 35 T.C. 906 (1961); *Charles J. Riley*, 35 T.C. 848 (1961); *Jacobson* v. *Commissioner*, 281 F. 2d 703 (C.A. 3, 1960), reversing 32 T.C. 893 (1959), are not applicable because the question there was whether the requisite "view," intent, or purpose, *Maxwell Temkin*, *supra*, 35 T.C. at 911, existed during construction. Here, whatever view was entertained necessarily existed at the time the stock was sold, which occurred prior to the completion of construction. This applies equally to the Raleigh corporation, since the finding that construction was "substantially" completed is not sufficient to create a postconstruction view. In *Edward Weil*, 28 T.C. 809 (1957), affirmed per curiam 252 F. 2d 805 (C.A. 2, 1958), we said (p. 815):

Partial completion, near completion, or even substantial completion are thus not effective substitutes for full completion of the "construction."

If it were necessary to have further support for this conclusion, it would be furnished by section 117(m)(3):

---

[5] "* * * It is not clear whether the sale of an interest whose value is attributable to uncollected rights to income gives rise to capital gain or ordinary income. * * *

"Because of the confusion in this area, basic rules have been set forth in order to * * * prevent the use of the sale *of an interest* in a partnership as a device for converting rights to income into capital gain.

"* * * The statutory treatment proposed, in general, regards the income rights as severable from the partnership interest and as subject to the same tax consequences which would be accorded an individual entrepreneur." (Emphasis added.) H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 70, 71 (1954).

SEC. 117. CAPITAL GAINS AND LOSSES.
    (m) COLLAPSIBLE CORPORATIONS.—

*       *       *       *       *       *       *

    (3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—
        (A) this subsection shall not apply unless, at any time after the commencement of * * * construction * * * such shareholder (i) owned * * * more than 10 per centum in value of the outstanding stock of the corporation * * *;
        (B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so * * * constructed * * *; and
        (C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such * * * construction * * *

Petitioner owned substantially more than 10 percent of the stock,[6] the sale occurred in much less than 3 years, and presumably the gain recognized during the taxable year was attributable "to the property * * * constructed," to a greater extent than 70 percent; otherwise petitioner's profit would not, in any event, be ordinary income. Both the statutory provisions—"In the case of *gain* realized by *a shareholder* upon his stock" (emphasis added)—and respondent's regulation[7] are designed to distinguish a distribution which is a corporate act, from the sale or exchange of a participating interest which arises from the individual action of each shareholder.

I find nothing in the purpose or provisions of the statute or of the regulation to authorize treatment of the proceeds of petitioner's regular business as capital gain notwithstanding the formal intervention of the corporate device.

FORRESTER, J., agrees with this opinion.