281 F.2d 703
 Lewis S. and Rose M. JACOBSON, Petitioners in No. 13,080.
Joseph and Rose Facher, Petitioners in No. 13,081.
William and Ruth Schmitz, Petitioners in No. 13,082.
Morris and Ida Winograd, Petitioners in No. 13,083.
Estate of Morris Kanengiser, Deceased, Joseph Facher, Executor and Estate of Fannie Kanengiser, Deceased, Esther Weiner, Sidney Kanengiser, Marvin Kanengiser, and Irving Kanengiser, Executors, Petitioners in No. 13,084.
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 13080-13084.
 United States Court of Appeals Third Circuit.
 Argued May 4, 1960.
 Decided July 26, 1960.
 
 Herman H. Krekstein, Philadelphia, Pa. (Merle A. Wolfson, Philadelphia, Pa., on the brief), for petitioners.
 Karl Schmeidler, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., on the brief) for appellee.
 Before KALODNER, HASTIE and FORMAN, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 The question on these petitions is whether taxpayers were justified in reporting as capital gains rather than ordinary income amounts they realized from the sale of their capital stock of Hudson Towers, Inc., a corporation formed and used for the building of a housing project. The Commissioner contends and the Tax Court has ruled that Hudson Towers, Inc., is a "collapsible corporation" within the meaning of Section 117(m) of the Internal Revenue Code of 1939, as amended by Section 212 of the Revenue Act of 1950, 64 Stat. 906, 26 U.S.C., 1952 ed., § 117(m), and as in force in 1950 and 1951 when the relevant transactions occurred. The Tax Court concluded that the taxpayers' gain on the sale of their stock was ordinary income and entered judgments for deficiencies. The taxpayers have appealed.
 
 
 2
 Before examining the evidence in these cases we consider the language and the meaning of the controlling statute. Section 117(m) requires that the gain from the sale of stock of "collapsible corporations" be treated as ordinary income. Subsection (2) (A) contains the following definition: "* * * the term collapsible corporation means a corporation formed or availed of principally for the manufacture, construction or production of property * * * with a view to * * * the sale or exchange of stock by its shareholders * * * prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property * * *." The disputed question of statutory interpretation in these cases is whether the "view to * * * the sale or exchange of stock", which under the statutory definition makes a corporation collapsible, must have existed before the construction of property was completed, or whether it is sufficient that this state of mind shall come into existence for the first time after the completion of construction.
 
 
 3
 On the face of the statute Congress is here indicating a state of mind which must attend and gives significance to certain action. That action, as specified in the statute, is not merely any formation or use of a corporation but rather the formation or use of a corporation to construct or produce property. The "view" with which a corporation is used for a particular purpose must necessarily be a view entertained at the time of such use. Thus, only by a distorting disregard of the phrase "for the * * * construction * * * of property" is it possible to reach the conclusion that the "view to * * * sale" contemplated by the statute can arise for the first time in connection with corporate activity after the work of construction is completed.
 
 
 4
 To us this seems so clear on the face of the statute that we would content ourselves with the foregoing brief analysis of the statutory text were it not for the fact that other highly respected courts have been persuaded to a contrary interpretation. Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108; Burge v. Commissioner, 4 Cir., 1958, 253 F.2d 765. However, there is an additional consideration which to us seems decisive in support of our reading of the statute and against the cited cases. The interpretation which to us seems most natural and reasonable has been adopted administratively and published in a formal Treasury regulation. Section 29.117-11 as added to Treasury Regulations III, I.R.C.1939, by T.D. 5999, 1953-1 Cum. Bull. 187, contains the following interpretation of the statutory definition of a collapsible corporation:
 
 
 5
 "Sec. 29.117-11 * * *
 
 
 6
 "(b) * * *
 
 
 7
 "A corporation is formed or availed of with a view to the action described in section 117(m) (2) (A) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange, or distribution is attributable to circumstances present at the time of the manufacture, construction, production or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of."
 
 
 8
 Thus, the regulation, adopting what is certainly not an arbitrary interpretation of the statute, treats a corporation as collapsible only if "the view to sale" shall have existed at the time of the construction in which the corporate entity was used, or if circumstances which subsequently induce sale were themselves within contemplation during the period of construction. We are guided by and shall apply the statute as thus reasonably interpreted in the regulations.[1]
 
 
 9
 This brings us to the facts of the present case. The taxpayers say that they have established by affirmative evidence, with nothing indicating the contrary, that neither the selling of the property in question nor any circumstance which later led to that sale was within their contemplation until after construction was completed. The record establishes that appellant Winograd was a builder and general contractor. He bought a tract of land with a view to building apartment houses on it. The other appellants became interested in the project. All of them then joined in organizing Hudson Towers, Inc., with articles of incorporation appropriate for a corporation which would construct and operate a housing project, after financing the enterprise under the provisions of the National Housing Act. Among other things the charter provided that the corporation would engage in no business other than the construction and operation of rental housing projects so long as the mortgage held by the Federal Housing Administration should be outstanding. Two hundred shares of common stock were issued, 70 to Winograd, the largest stockholder, and the rest divided among the other petitioners.
 
 
 10
 The corporate enterprise proceeded normally with the construction of federally financed apartment buildings. Construction was completed about the middle of June 1950. All but 5 or 6 of a total of 215 apartments were quickly rented. In September and October 1950, under circumstances which we shall examine in detail later, the stockholders discussed selling their stock. On November 1st they formally authorized the sale of their stock, and a purchaser was found soon thereafter. The sale was consummated February 28, 1951.
 
 
 11
 The several appellants testified in these proceedings that they formed the corporation and undertook this project with a view to long term investment in apartment houses for the production of rental income and without any intention or contemplation of selling their respective holdings. The evidence showed and the Tax Court found that "all of the group at one time or another and sometimes on a continuing basis had investments in income producing real estate". Moreover, as the Tax Court also found, "none of the petitioners was in the business of buying or constructing and selling apartment buildings or any other kind of real estate".
 
 
 12
 Specially noteworthy is the Tax Court's finding that "twice during July, 1950, after construction had been completed, a real estate broker sought authority to sell the apartment houses. He was informed that the properties were not for sale". The subsequent reversal of this position was explained in detail by the appellants. It was testified and the Tax Court found that "some time between September 15th and October 1, 1950, Winograd's attention was called to a crack in one of the buildings". One small crack was observed extending over three or four bricks and there were other minor ones in joints. The buildings had been constructed on made ground, built up by depositing fill which had been obtained in connection with the construction of the Lincoln Tunnel. No engineering or other technical opinion was solicited with reference to these cracks. Indeed, Winograd told no one except his associates of his discovery. To them he suggested that they sell their holdings. They countered with a proposal that they buy his interest. However, at a later meeting all agreed to sell and a buyer was soon found.
 
 
 13
 On this record we think the conclusion is unavoidable that the parties did not contemplate selling their stock until after the completion of construction. Nor were circumstances which later led to the sale within reasonable contemplation before construction was completed.
 
 
 14
 The refusal of the stockholders to permit a broker to list or offer the property for sale in July, the fact that the parties had made other long term investments in rental property and the manifest unwillingness of the majority to sell even after Winograd discovered the cracks and recommended sale, are all facts found by the Tax Court. In aggregate they make a very strong and persuasive case in support of the appellant's claim that they had no thought of selling until after the cracks were discovered.
 
 
 15
 The only facts to which the Tax Court points as creating any doubt about this matter are the smallness of the cracks and the fact that no expert judgment was obtained as to their seriousness. But these circumstances are at most equivocal in their implications and certainly not inconsistent with genuine concern about the stability of the buildings and a change of position based upon fear that the buildings might settle appreciably. If the self-serving testimony of the taxpayers stood alone its rejection might be permissible. But when several other established facts so strongly corroborate their testimony and nothing significant appears to the contrary, we think it must be recognized that the taxpayers have established their contention. There is simply no substantial evidentiary basis for a contrary conclusion.
 
 
 16
 For these reasons the decision of the Tax Court will be reversed.
 
 
 
 Notes:
 
 
 [1]
 We assumed the correctness of this interpretation, but without deciding the question, in August v. Commissioner, 3 Cir., 1959, 267 F.2d 829. That case turned on the presence of evidence establishing that circumstances to which a disposal of stock was attributable were in fact contemplated and anticipated by the stockholders during the construction period. Here, as will appear later, there is no such evidence and the legal question left open in the August case must be decided