Otis N. ELLIOTT and Tacy M. Elliott, Husband and wife, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Alfred T. SULMONETTI and Jeanette Sulmonetti, Husband and wife, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Sanford J. LANGOE and Shirley M. Langoe, Husband and wife, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 500–59, 60–44, 60–468.

United States District Court
D. Oregon.
April 18, 1962.

George W. Mead, Portland, Or., for plaintiffs Otis N. Elliott and Tacy M. Elliott and Alfred T. Sulmonetti and Jeanette Sulmonetti.

Dean M. Alexander, Portland, Or., for plaintiffs Sanford J. Langoe and Shirley M. Langoe.

C. E. Luckey, U. S. Atty., and Edward J. Georgeff, Asst. U. S. Atty., of Portland, Or., and by Dale E. Anderson, of the Dept. of Justice, Washington, D. C., for the United States.

SOLOMON, Chief Judge.

Plaintiffs brought these actions (which were consolidated for trial) to recover income taxes which they assert were unlawfully assessed and collected for the year 1952. Specifically, they claim that the Commissioner of Internal Revenue erred in determining that the Park Plaza, Inc., was a collapsible corporation and hence the profit realized by plaintiffs from the sale of their stock was taxable as ordinary income and not entitled to capital gains treatment.[1]

P. M. Langoe, his son Sanford Langoe, Otis N. Elliott and Judge Alfred T. Sulmonetti organized Park Plaza, Inc., in February, 1950, to take advantage of Title 6, § 608 of the National Housing Act, 12 U.S.C.A. § 1743. § 608 provided F.H.A. financing to qualified corporations in order to promote apartment house construction and relieve the post-war housing shortage. To qualify, a corporation had to obtain F.H.A. approval of its corporate charter, the prospective building site and the architect and construction plans.

P. M. Langoe had constructed several small apartment houses in partnership with his son Sanford Langoe. In 1949, he became interested in constructing an apartment to be financed under § 608. He obtained options on a prospective building site in the Park Blocks, near downtown Portland, and consulted Judge Sulmonetti, then a lawyer engaged in private practice. Judge Sulmonetti had already organized several qualified corporations and owned an interest in one such corporation. He knew Elliott and brought him into the venture as its principal financial backer.

In June, 1949, the F.H.A. approved the building site for the construction of a modern eleven-story apartment building, and tentatively agreed to guarantee a $1,300,000 loan to a qualified corporation. The Langoes, Judge Sulmonetti and Elliott then formed a partnership, known as Lesco, to acquire the site and organize a corporation, Park Plaza, Inc., which would be qualified to receive financing under § 608.

In August, 1949, the Langoes and Judge Sulmonetti each contributed $10,-000 and Elliott contributed $45,000 to Lesco for its use in purchasing the optioned land. Elliott's contribution was secured by two notes, one for $25,000 at six per cent interest and one for $20,000 without interest. Each note was signed by the Langoes and Judge Sulmonetti. The $25,000 note represented a loan of that sum to the partnership. The $20,000

1.  § 117(m) (2) (A), Int.Rev.Code of 1939, 26 U.S.C.A. § 117(m) (2) (A).

note, however, was used as an escape device enabling Elliott to withdraw from the venture at a later time. If he did not withdraw, the note would be cancelled and Elliott, along with the Langoes and Judge Sulmonetti, would take a one-third interest in the prospective corporation.

The partnership selected Reimers and Jolivette as the general contractors, and sold them the building site for $65,000, approximately $3,900 more than the partnership paid for the land. Construction of the Park Plaza began in March, 1950. After the construction was well under way, Elliott, in accordance with the partners' original understanding, cancelled the $20,000 note and received 200 shares of the capital stock of Park Plaza, Inc. Judge Sulmonetti and Sanford Langoe each transferred 100 shares to Elliott and reported the transaction as a long-term capital gain in their respective tax returns for 1950. After this transfer, each partner owned 200 shares of stock.

The Park Plaza was completed in July, 1951, at a cost, including the land, of $1,-181,514. The difference between this sum and the $1,300,000 loan was used to pay architects' fees and other costs in connection with the property. The corporation began renting apartments prior to completion, and by March, 1952, substantially all of the apartments were occupied.

While the Park Plaza was under construction, P. M. Langoe acted as an inspector, made minor changes in the plans and worked out differences between the contractor and architect. After the building was completed, he remodeled some of the apartments to suit individual tenants and, with the apartment manager, actively supervised the building.

In February, 1952, Charles Montgomery, a real estate salesman, called and informed Judge Sulmonetti that he had a prospect who was anxious to buy a large apartment house in Portland. Montgomery said that negotiations for another apartment house had been unsuccessful and that his prospect, William E. Clavier, wanted to see the Park Plaza. Judge Sulmonetti told him that the Park Plaza was not for sale but agreed to let him show Clavier through the building. After seeing the apartment house, Clavier was ready to make an offer. Montgomery then contacted Sanford Langoe, who also said the building was not for sale. At Montgomery's insistence, negotiations continued, and eventually an offer was made at a meeting of all of the stockholders. This offer was refused. Shortly thereafter, P. M. Langoe suffered two strokes, and he was advised to retire. He then decided to sell and persuaded Judge Sulmonetti to vote with him for the sale of the Park Plaza to Clavier. Elliott continued to oppose the sale, but finally yielded to the pressure of Langoe and Sulmonetti.

On March 27, 1952, approximately nine months after the Park Plaza had been completed, a contract was executed by which plaintiffs agreed to sell and Clavier agreed to purchase all of Park Plaza, Inc.'s capital stock for $287,811.

The issue in this case is whether the Park Plaza, Inc., was a collapsible corporation. § 117(m) (2) (A) defines a collapsible corporation as follows:

"(A) * * * the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction or production of property * * * with a view to—

(i) the sale or exchange of stock by its shareholders * * * prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property. * * *"

■ A corporation is not collapsible within the meaning of the statute unless the taxpayers' view toward sale existed prior to completion of the building. Jacobson v. Commissioner, 3 Cir. 1960, 281 F.2d 703; § 29.117–11 as added to Treasury Regulations III, Int.Rev.Code 1939, by T.D. 5999, 1953–1, Cum.Bull.

187. Treasury Regulation III, supra, provides that a sale attributable solely to unforeseen circumstances arising after construction does not make the corporation collapsible.

The parties agree that taxpayers sold Park Plaza, Inc., prior to a realization of a substantial part of its net income. The taxpayers claim that they considered the Park Plaza a long-term investment and did not decide to sell until after P. M. Langoe became ill and was advised to retire.

Government counsel contend that the taxpayers entertained a "view to sale" prior to completion of the Park Plaza. They point out that prior to his participation in Park Plaza, Inc., Judge Sulmonetti had been involved in another 608 corporation which was sold a short time after the apartment house was completed. In that case, as well as in this one, the apartment house was sold because an active participant in the project became ill. They also point out that the Langoes had been engaged in the construction and sale of residences and small apartment houses for several years prior to the Park Plaza project. All of them were sold on completion and these sales were the Langoes' sole source of income. Thus, if they built the Park Plaza as a long-term investment, it was a departure from their previous course of business.

The Government also relies upon the fact that the Lesco partnership distributed a $13,000 finder's fee from the New York Life Insurance Company and the $3,900 difference between the cost of the site and the price at which it was sold to Reimers and Jolivette. The Government asserts that these distributions are inconsistent with a long-term investment.

The facts in the present case are similar to those in Jacobson v. Commissioner, 3 Cir. 1960, 281 F.2d 703. There, the taxpayers were in the construction business previously and owned income-producing real estate. A broker attempted to list their apartment house a short time after it was completed and the taxpayers refused. However, when cracks appeared in the building a few months later, the taxpayers decided to sell their stock. The Tax Court held the corporation was collapsible, but the Court of Appeals reversed.

In each case in which a § 608 corporation was held to be collapsible, there was substantial evidence of an original view toward sale. Corporations were organized with two classes of stock so that one class could be redeemed as soon as the building was completed. See Burge v. Commissioner, 4 Cir. 1958, 253 F.2d 765, 74 A.L.R.2d 664; Payne v. Commissioner, 5 Cir. 1959, 268 F.2d 617. Buildings were revalued upon completion so as to create a capital surplus for immediate distribution. See Glickman v. Commissioner, 2 Cir. 1958, 256 F.2d 108. The mortgage guarantee was increased during construction to create a surplus for distribution, and the stock was listed for sale shortly after the building was complete in Mintz v. Commissioner, 2 Cir. 1960, 284 F.2d 554.

There is no merit to the Government's contention that the transfer to Elliott of 200 shares of stock for the cancellation of his $20,000 note was a sale or exchange of stock or a distribution to the other shareholders. Elliott was one of the initial sponsors of the project and an original subscriber to Park Plaza, Inc.'s capital stock. The parties intended him to be a one-third owner of the corporation from its inception. The note was a security device which permitted him to withdraw from the venture without losing his $20,000.

I find that the plaintiffs did not entertain a view toward sale at the time they organized Park Plaza, Inc., or at any time during the construction of the apartment house. The sale was the result of circumstances which arose after the Park Plaza was constructed. The corporation was therefore not collapsible within the meaning of § 117(m).

Counsel for plaintiffs shall prepare appropriate findings of fact, conclusions of law and judgments in favor of the plaintiffs.