Todd **TIBBALS** and **Helen A. Tibbals**
v.
The **UNITED STATES.**
No. 346–60.

United States Court of Claims.
June 10, 1966.

Whitaker, Senior Judge, dissented in part.

Daniel A. Taylor, Chicago, Ill., attorney of record, for plaintiffs. K. Martin Worthy, Hamel, Morgan, Park & Saunders, Washington D. C., and Taylor & Kelly, Chicago, Ill., of counsel.

Richard J. Boyle, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

OPINION

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM:

This income tax refund case, involving the years 1951–1954, was referred to Trial Commissioner Lloyd Fletcher with directions to make appropriate factual findings and to submit his recommendation for a conclusion of law. At this stage there remain two entirely separate issues in the case, and the commissioner's report contains an opinion, finding, and recommended conclusion on each aspect. His recommendation is for the plaintiffs on both issues. The parties accept the commissioner's opinion, findings, and conclusion on the second issue, involving the sale by the principal taxpayer of stock in a wholly-owned corporation (Parklawn Manor, Inc.). Exceptions have been taken by the defendant, briefs filed, and oral argument had on the first issue, involving gain from the sale of real estate. On that issue we differ to some extent from Commissioner Fletcher; our views are set forth in Part I,

infra. On the second issue, as to which no exception has been filed, we agree with the trial commissioner and adopt the portion of his opinion dealing with that question; it appears in Part II, infra. On the whole case, we decide that plaintiffs are entitled to recover in accordance with this opinion, and enter judgment to that effect. The amount of recovery will be determined under Rule 47(c).[1]

I

*Taxpayer's Sales of Real Estate* [2]

■ This part of the case raises the recurring question whether certain parcels of real estate, prior to their sale, were "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Int.Rev.Code of 1939, § 117(a) (1) (A). A guiding rule in this class of tax litigation is that each case must be decided on its own facts and circumstances. Miller v. United States, 339 F.2d 661, 663–664, 168 Ct.Cl. 498, 504 (1964); Browne v. United States, 356 F.2d 546, 174 Ct.Cl. — (February 1966). A detailed recitation of the facts is therefore necessary.

Plaintiff[3] is an architect in Columbus, Ohio. He began the practice of his profession in 1935 as a sole proprietor but later formed a partnership with other architects under the firm name of Tibbals, Crumley, and Musson. The firm has always engaged in a general architectural business and has designed and supervised the construction of numerous public buildings, residences, and private commercial buildings in the Columbus area.

During 1946 and 1947, in addition to the practice of his profession, plaintiff engaged in the construction of 54 houses on his own account. These houses were built on various unimproved lots which plaintiff had acquired in prior years. In 1946 he individually sold 50 such houses, and in 1947 he sold the remaining four. At no time thereafter has plaintiff, solely in his individual capacity, engaged in the construction of houses for sale to customers. Instead, he formed three corporations, Columbus Southern Development Company in 1946, Martha Washington Builders, Inc. in 1949, and Arlington Ridge Development Company in 1951, all the stock of which plaintiff has owned during the times material herein. These three closely-held corporations engaged extensively in the construction of houses on unimproved land transferred to them either by plaintiff or others, and they held such real estate primarily for sale to customers in the ordinary course of their trade or business. Also, during the period 1942 through 1953, plaintiff either owned or controlled numerous other corporations which engaged in various related activities, such as the ownership and management of rental properties (including FHA housing projects), the manufacture and sale of lumber, and the manufacture and sale of panels for prefabricated houses.

In early 1950 plaintiff entered into the transaction which was to precipitate the dispute herein. He and his brother, Charles E. Tibbals, Jr.,[4] jointly purchased a tract of land previously subdivided into lots in an area on the outskirts of Columbus known as the River

1. A number of other issues raised by the petition have been disposed of by an Agreement of Partial Settlement filed prior to the trial. The effect of this partial settlement on the amount of any final judgment will be reflected in the subsequent proceedings pursuant to Rule 47(c).

2. Most of the statement of facts in this Part is taken from Commissioner Fletcher's opinion although we have another view as to the taxation of the proceeds of two of the three sales.

3. The word refers to Todd Tibbals. His wife, Helen, is a party to the action only because she filed joint tax returns with her husband.

4. Charles lived in Tennessee where he managed a hardwood flooring manufacturing company. He and plaintiff owned that company in equal shares.

Ridge Subdivision.[5] More than six months later, the brothers disposed of these lots by three separate sales at different times and to different purchasers under circumstances related below. In their respective tax returns, each brother treated his very substantial gain from these sales as capital gain. The Commissioner of Internal Revenue disagreed and held the gain to be ordinary income.

In the ensuing litigation, Charles has been successful. The Tax Court of the United States decided that Charles did not hold his one-half interest in the lots primarily for sale to customers in the ordinary course of his trade or business and had properly reported his share of the realized gain as long-term capital gain. Charles E. Tibbals v. Commissioner, 17 T.C.M. 228 (1958). Because plaintiff's activities with respect to the lots were more extensive than, and in part different from, those of his brother, this court is now called upon to decide whether the two stand in different tax positions.

The River Ridge Subdivision was originally acquired and subdivided into about 1,200 lots sometime during the 1920's by the Arlington Ridge Realty Company. Plaintiff has never held any stock in that corporation, but he was acquainted with some of its officers and had a general familiarity with the area in which the subdivision was located. During the years of its ownership, Arlington Ridge Realty Company had sold about two-thirds of the 1,200 lots to individual purchasers, and in the late 1940's the county had installed a sewer system in the subdivision. Very little other development took place, however, and the tract continued to look like a "big briar patch." In early 1950, due apparently to stockholder dissension, the officers of Arlington Ridge Realty Company decided to sell the company's remaining lots as a block and then liquidate the corporation. The company's real estate salesman approached plaintiff, who was a neighbor and friend, told him that the remaining lots were available as a block for $20,000, and urged him to buy them. Despite their ragged appearance and lack of improvements,[6] plaintiff concluded that the asking price was cheap because of the location of the lots immediately north of one of the most desirable residential areas in Columbus. Accordingly, on February 21, 1950, he signed an agreement to purchase the lots, subject, however, to the approval of his brother whose financial participation he apparently needed. He contacted Charles in Tennessee, and it was agreed between them that they would join in the purchase. The transaction was closed on April 27, 1950.

A few days thereafter, plaintiff was approached by an acquaintance who had recently gone into the real estate business and who had been circulating a petition among various lot owners for the construction by the county of water mains in River Ridge. This man asked plaintiff as the joint owner of the largest single block of lots to sponser the petition and to help defray some minor expenses. Plaintiff agreed to do so and authorized his attorney, George H. Chamblin, to enter into the matter. Chamblin thereupon prepared new petitions for water, sewer, and street improvements and presented them to the county officials. In his testimony, plaintiff tried to make light of his activities in these efforts to get county improvements, but the record is clear that, acting mostly through his attorney, he was the moving force behind them. He knew that the proposed improvements would substantially enhance the value of his and his brother's holdings in River Ridge. The Board of County Commissioners acted

---

5. The 1950 purchase was of a tract comprising 357 lots. In 1951, pursuant to an option held by plaintiff, the brothers enlarged their holdings by the purchase of an additional 79 lots in the subdivision for a total acquisition of 436 lots.

6. At this time plaintiff was not aware that there was a considerable sewer development underground in the subdivision.

favorably on the petitions. In the fall of 1951 the county commenced construction of the improvements and completed the work in early 1953.

When plaintiff and his brother purchased the River Ridge lots, it was orally agreed between them that, since Charles lived in Tennessee, the legal title to the property would be held for convenience in plaintiff's name.[7] In April 1951, two of the lots were sold to Cozy Cottages, Inc., one of plaintiff's wholly-owned corporations, for the purpose of building two experimental prefabricated homes thereon.

There were no further sales until June 1952. In September of the previous year plaintiff had organized a wholly-owned corporation under the name of Arlington Ridge Development Company for the purpose of building houses on lots in River Ridge. To that end, in June 1952 (the contract of sale was entered into on September 21, 1951), plaintiff and Charles sold 100 lots for about $80,000 to the Development Company which proceeded, under plaintiff's general supervision, to build houses on about 60 of the lots. The county improvements were only partially completed, and the houses did not sell very well. Of the remaining lots, about 15 were sold by the Development Company to the Columbus Home Builders Association for a Parade of Homes; 20 lots were sold by it to a man named Aleshire who was one of the builders in the Parade of Homes; and ten were sold to Kay Investments, Inc., the stock of which was owned by plaintiff. Although the Development Company was the seller in the above sales contracts, in many instances the deeds to the purchaser, for convenience and to save conveyancing expense, ran directly from plaintiff to the purchaser, rather than to Arlington Ridge Development Company and then to the purchaser.

The remaining 333½ [8] lots were sold in October 1952 to Lewis Leader and his nominee corporation for a gross sales price of $266,800, which amounts to an average price of $800 per lot. In Charles' case the Tax Court found that the Leader sale and the two preceding sales were effected without activity on the part of the joint owners; that neither plaintiff nor his brother were licensed real estate brokers; that the property was not listed with real estate agents, nor advertised for sale, and no "for sale" signs were erected thereon. The Tax Court further found that at the time of the sale to Leader of the 333½ lots, individual lots in the area were selling at prices ranging from $1,000 to $1,500. The record here, as well as in the Tax Court, amply supports those findings. Prior to the sale of the 333½ lots to Leader, plaintiff had been solicited by a number of people, including real estate brokers, to sell individual lots, but he and his brother refused to do so. In the fall of 1952, one McGreevy, an employee of the Guaranty Title and Trust Company of Columbus, introduced Leader to plaintiff. Prior thereto McGreevy had been assisting Leader in the obtaining of mortgage loans, and Leader had informed McGreevy that he would like to buy some land in Columbus on which to build houses. He asked McGreevy's help in finding some available land with sewer and water improvements. McGreevy knew of plaintiff's lots in River Ridge, and he assumed that they might be for sale. He introduced Leader to plaintiff, and negotiations followed between the two. Plaintiff consulted his brother with regard to an offer from Leader to purchase the 333½ lots, and while Charles would have preferred to have held the lots longer for further appreciation in value, he deferred to plaintiff's judgment that a bulk sale should be made to Leader. In October 1952, plaintiff and Leader reached an agreement of sale which was closed the following month.

---

7. The oral agreement between the brothers was later reduced to writing at Chamblin's suggestion.

8. The one-half lot discrepancy apparently arose out of the second purchase of 79 lots by plaintiff and Charles in February 1951. It is of no moment here.

On these facts the trial commissioner—treating together all three sales by plaintiff (and his brother)—determined that the River Ridge property was not held by Todd Tibbals primarily for sale to customers in the ordinary course of his trade or business. Our discussion starts from the fundamental premise that "primarily" means "of first importance" or "principally". Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). We also consider the three sales individually since "the taxpayer's purpose of holding property may vary with respect to different tracts. Upon the capital gain issue, purpose or intention must be determined with respect to each tract and such purpose may vary with respect to the different tracts." Municipal Bond Corp. v. Commissioner of Internal Revenue, 341 F.2d 683, 689–690 (C.A.8, 1965). Also, "[i]t will not be questioned that a property owner may hold some of it for sale to customers in the ordinary course of business and hold the remainder as capital assets." Wood v. Commissioner of Internal Revenue, 276 F.2d 586, 590–591 (C.A.5, 1960). See, for further examples, Margolis v. Commissioner of Internal Revenue, 337 F.2d 1001, 1005 (C.A.9, 1964); Burgher v. Campbell, 244 F.2d 863, 864 (C.A.5, 1957); Lobello v. Dunlap, 210 F.2d 465, 469 (C.A.5, 1954).

With regard to the sale of the two lots (in April 1951) to Cozy Cottages, Inc. and the sale of one hundred lots (in June 1952) to the Arlington Ridge Development Company, we disagree with the trial commissioner and rule that that property was held by Todd Tibbals primarily for sale to customers in the ordinary course of his trade or business. Several factors lead us to the conclusion that, from the acquisition of the land up to these sales, this part of the River Ridge real estate was acquired and held for resale in a real estate venture. Plaintiff was no stranger to real estate development. He had previously built houses on his own account (in 1946 and 1947); from that time on, he had formed closely held corporations which engaged extensively in development and in the real estate business, and he had often transferred unimproved land (at his cost) to these controlled companies. He was sufficiently connected with real estate that he had once been president of the Columbus Home Builders Association. Immediately upon acquisition of River Ridge land in 1950, plaintiff became the "moving force" in a project to have the county put in water, sewer, and street improvements. This work began in the fall of 1951 and was completed in the early part of 1953. The sale to Cozy Cottages, Inc., one of plaintiff's wholly-owned corporations—in April 1951, even before the improvement work began—was for the purpose of building two experimental prefabricated houses (obviously to see whether they would evoke consumer interest). The Arlington Ridge Development Company, likewise wholly-owned by plaintiff, was created in September 1951 for the specific purpose of building houses on 100 lots in the River Ridge subdivision. When the lots were sold by plaintiff to it, the Development Company proceeded, under plaintiff's general supervision, to build houses on about 60 lots, for sale to home-owners.

In all of these respects, the sales to Cozy Cottages, Inc. and to the Development Company are remarkably close to the sale by stockholders to their controlled corporation, the profits from which we recently held in Brown v. United States, supra, 356 F.2d at 547, 174 Ct.Cl. at ——, to be taxable as ordinary income. The plaintiff's background is similar to that of the taxpayers in *Browne* and his dealings with the property were quite comparable. As in that case, "here, we have substantial personal developmental activities, plus use of and sale to a controlled corporation which continued the development, plus some comparable purchases by taxpayer[s] of other real estate for development." 356 F.2d at 547, 174 Ct.Cl. at ——. These elements add up to an acquisition, holding and sale primarily in the ordinary course of a real estate business carried·on by plaintiff in his indi-

vidual capacity, with the aid of his controlled corporations. See, also, Engasser, v. Commissioner, 28 T.C. 1173 (1957).[9]

■ To reach this conclusion we do not disregard corporate entities or say that the business of plaintiff's wholly-owned companies was automatically his business. It is established that, in determining the trade or business of an individual taxpayer, the business activities of his closely-held corporation will not be attributed to him (see, e.g., Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963)), but it is also true that a taxpayer may be individually in the same business as his corporation, may make that business his own, or may utilize the company in his own business. It is therefore appropriate, in circumstances such as these, to see whether the taxpayer uses his controlled company—for instance, as agent, co-participant, or joint venturer—to implement or further his own personal business, as he easily can.[10] That type of inquiry has often been made by the courts, including this one, in cases testing (under § 117(a) of the 1939 Code or § 1221 of the 1954 Code) whether profit from a sale of property was ordinary income or capital gain. See Boeing v. United States, supra, 168 F.Supp. at 767–769, 144 Ct.Cl. at 84–87; Browne v. United States, supra; Burgher v. Campbell, supra, 244 F.2d at 864–865; Lakin v. Commissioner of Internal Revenue, 249 F.2d 781 (C.A.4, 1957); Kaltreider v. Commissioner of Internal Revenue, 255 F.2d 833, 836, 837, 838–839 (C.A.3, 1958); Bauschard v. Commissioner of Internal Revenue, 279 F.2d 115, 118 (C.A.6, 1960) (individual joint venturer); Heebner v. Commissioner of Internal Revenue, 280 F.2d 228 (C.A.3, 1960), cert. denied, 364 U.S. 921, 81 S.Ct. 285, 5 L.Ed.2d 260; Patter-

son v. Belcher, 302 F.2d 289, 294, 297 (C.A.5, 1962), cert. denied, 371 U.S. 921, 83 S.Ct. 289, 9 L.Ed.2d 230; H-H Ranch, Inc. v. Commissioner of Internal Revenue, 357 F.2d 885 (C.A.7, 1966); Engasser v. Commissioner, supra, 28 T.C. 1173. That is what we do in this case, and why we consider it proper to take account of the nature and activities of the controlled companies, Cozy Cottages, Inc. and the Arlington Ridge Development Company, in deciding that plaintiff's sales to them brought him ordinary income rather than capital gain.

■ With respect to the sale to Lewis Leader, in October 1952, we have a different view. When plaintiff purchased the River Ridge land early in 1950, he may have intended to develop and sell all or most of it. But we judge that by the time of the organization of the Arlington Ridge Development Company in September 1951, plaintiff had probably narrowed his development objectives to the 100 or 102 lots with which his Development Company and Cozy Cottages, Inc. were to be concerned (and which we have just discussed).[11] At any rate, it seems to us that by October 1952, when the last sale (the Leader transaction) occurred, plaintiff no longer held the remaining 333½ lots primarily for sale to customers in the ordinary course of a real estate business. Apparently, the 50 to 60 houses being built on the land transferred to the Development Company had not been selling well, and we infer that plaintiff, if he had originally intended to develop or retail all of his 436 lots in River Ridge, had given up that intention and had contented himself with the 102 lots previously sold to his controlled corporations. If he had wished to sell the 333½ lots individually, he could have made a considerably greater profit than

---

9. Gordy v. Commissioner, 36 T.C. 855 (1961), on which plaintiff leans heavily, is distinguished in Browne v. United States, supra.

10. Along with many others, this court has pointed out "that one may .conduct his business through others." Boeing v.

United States, 168 F.Supp. 762, 769, 144 Ct.Cl. 75, 87 (1958).

11. The Development Company was organized to build houses on 100 lots in River Ridge, and plaintiff has denied that either he or his companies intended to build more.

he obtained from the disposition in bulk to Leader.[12] However, neither plaintiff nor his companies made any effort to develop or retail this land. Leader was, of course, wholly independent of plaintiff, and plaintiff had no interest in Leader's use or development of the property.

A taxpayer's purpose can change during the course of his holding of property, and in such cases it is the dominant purpose of his holding during the period prior to the sale which is critical. See Palos Verdes Corp. v. United States, 201 F.2d 256, 258–259 (C.A.9, 1952); Goldberg v. Commissioner of Internal Revenue, 223 F.2d 709, 712 (C.A.5, 1955); Miller v. United States, supra, 339 F.2d at 664–665, 168 Ct.Cl. at 506, (concurring opinion). We find that, by the time of, and for some time prior to, the sale to Leader in October 1952, plaintiff held the remaining 333½ lots as an investment, and that his financial interest was in "the realization of appreciation in value accrued over a substantial period of time" (Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 86 S.Ct. 1497, 1500, 4 L.Ed.2d 1617 (1960)), rather than in the profits "arising from the everyday operation of a business" (Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955)). This is borne out by the circumstances we have mentioned, as well as by the fact that plaintiff's brother Charles would have preferred to hold these lots longer for further appreciation in value. Plaintiff has therefore overpaid his tax with respect to the gain on this sale.

## II

### Sale of Parklawn Stock

Commissioner Fletcher's opinion on the second question, to which neither party excepts and which the court adopts, is as follows:

The other remaining issue in this case involves the proper tax treatment to be accorded plaintiff's realization of gain on the sale of his stock in Parklawn Manor, Inc. (Parklawn). The resolution of this question requires consideration of a complicated statutory enactment whereby, in 1950, Congress cast a shadow over "the rainbow leading to the capital gain pot of gold"[13] by turning its attention to an ordinary-income-to-capital-gain conversion device known to the tax bar by the picturesque name of the "collapsible corporation."

Through an intensive development of this sophisticated device, Hollywood had proved that its expertise in the art of make-believe was by no means confined to the entertainment industry. An outstanding actor, producer, and director would form a corporation to produce a single motion picture with a view toward liquidating the corporation as soon as the picture could be realistically appraised but before realization of any appreciable profits at the corporate level. Upon completion of the picture and after negotiation of a contract for distribution, the corporation would be liquidated, or "collapsed," its assets being transferred in kind to its stockholders as joint owners. The collapsed corporation paid no tax, of course, on the distribution in liquidation, and the stockholders reported the difference between the cost of their stock and the fair market value of their interest in the corporate assets as long-term capital gain. The fair market value of the picture was then amortized over the estimated life of the film, and, accordingly, only the excess of the distribution receipts over such amortized basis was taxed at ordinary income rates. Hence, nearly all the profits which the actor, producer, and director had earned

12. As the Tax Court observed, in Charles Tibbals' case, regarding the sale to Leader: "Absence of motive to make a greater profit is an element indicating that the property was not held primarily for sale to customers in the ordinary course of trade or business." Tibbals v. Commissioner of Internal Revenue, 17 T.C.M. 228 (see finding 7).

13. See Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 1002 (1956).

by their services in the production and distribution of the picture were taxed as capital gain. See Pat O'Brien v. Commissioner of Internal Revenue, 25 T.C. 376 (1955). The same pattern was employed in the building construction industry. See Freeman, Collapsible Corporations, 11 N.Y.U. Inst. 407, 408 (1953); Mertens, Law of Federal Income Taxation, Vol. 3B, Sec. 22.55.

■ Congress attempted to foreclose this practice by the addition of section 117(m) to the 1939 Code.[14] That section provides, with certain limitations not applicable here, that the gain from sale or exchange of stock of a collapsible corporation shall be considered a gain from the sale or exchange of property which is not a capital asset, and hence taxable at ordinary income rates. Insofar as pertinent to this case, the section goes on to define a collapsible corporation as:

> * * * a corporation formed or availed of principally for the * * * construction, * * * of property, * * * with a view to—

> (i) the sale or exchange of stock by its shareholders * * * prior

to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and

> (ii) the realization by such shareholders of gain attributable to such property.

The pertinent parts of the Regulations promulgated under this section are contained in Reg. 118, Section 39.117–(m) (1) (b) and are set forth in the footnote below.[15]

It is at once apparent that both the statute and the interpretative regulations speak, at least partially, in subjective terms. "Thus the process of psychoanalysis has spread to unaccustomed fields".[16] By conveying its message in terms of the taxpayer's subjective motive, the statute leads one irresistibly to the conclusion that the problem to be solved must be essentially a question of fact. See Rev.Rul. 56–50, 1956–1 C.B. 174, 175. Did plaintiff form, or avail himself of, Parklawn "with a view to" selling his Parklawn stock before Parklawn had realized a substantial part of

14. After considerable overhauling, the section now appears as section 341 of the 1954 Code.

15. "(3) Under section 117(m) (2) (A), the corporation must be formed or availed of with a view to the action therein described, that is, the sale or exchange of its stock by its shareholders, or a distribution to them, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and the realization by the shareholders of gain attributable to such property. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated unconditionally, conditionally, or as a recognized possibility."

 * * * * *

"(4) A corporation is formed or availed of with a view to the action described

in section 117(m) (2) (A) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange, or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of."

16. Cardozo, J., dissenting in United States v. Constantine, 296 U.S. 287, 299, 56 S. Ct. 223, 228, 80 L.Ed. 233 (1935).

the net income to be derived from its housing project?

In determining whether plaintiff had the proscribed "view," it is necessary to inquire into the history of his dealings with, and ultimate sale of, his stock in Parklawn, the corporation alleged by defendant to be collapsible. Parklawn was formed by plaintiff in October 1950 for the purpose of engaging in the business of constructing, owning, and operating rental residential property. He acquired all of its common stock for $1,000, and the Federal Housing Administration (FHA) acquired all of the preferred stock for $100. Plaintiff was the president of the corporation, and his attorney, George H. Chamblin, was its secretary.

Shortly after its incorporation, Parklawn acquired from another one of plaintiff's corporations nearly 41 acres of vacant land in Columbus for the purpose of constructing thereon what was known as an FHA 608 housing project. With financing guaranteed by FHA, Parklawn constructed the project under the name of Parklawn Manor. It consisted of 384 family units contained in 156 buildings. The construction of all the housing units was completed, and they were occupied in their entirety, before the end of 1951.

Meanwhile, on April 5, 1951, C. E. Tibbals, Sr., plaintiff's father, had formed a corporation under the name of Lincoln Management Co. (Lincoln) to engage in the rental and management of rental real estate. Lincoln set up the original rental program for Parklawn Manor and procured all the original tenants under a management contract with Parklawn which expired in April 1952.

As president of Lincoln, Tibbals Sr. directed its activities in renting the Parklawn Manor units until the expiration of the management contract. He owned all of Lincoln's outstanding stock until January 12, 1953. On that date he created an *inter vivos* trust in which he appointed George H. Chamblin as trustee, named plaintiff's children as primary beneficiaries, and transferred to the trust all his shares of Lincoln stock.

Thereafter, in August of the same year, Chamblin suggested to plaintiff that he sell his stock in Parklawn to Lincoln. In making this suggestion, Chamblin appears to have been motivated by several considerations. For one thing, as secretary of Lincoln he was aware that it had excess assets available, and he believed that using those assets to acquire Parklawn would be beneficial to the Tibbals Sr. trust whose interests he was obliged, as trustee, to promote. Also, Tibbals Sr. had complained that neither Lincoln, nor he as its president, had enough to do, and as Chamblin saw it, the acquisition of Parklawn would remedy this situation.

Plaintiff's initial reaction to Chamblin's suggestion was one of surprise. Prior to this time he had given no thought to selling his Parklawn stock. However, upon considering the suggestion further and after discussing it with his father, he concluded that the idea was a good one and should be executed.

Consideration was then given to the matter of a selling price. Because of the family relationships involved, both plaintiff and Chamblin (who bore a fiduciary relation to plaintiff's children under the Tibbals Sr. Trust) felt that the price paid by Lincoln for the Parklawn stock should be a fair and reasonable one. The opinion of a leading real estate appraiser in the area was obtained as to the fair market value of Parklawn's land and improvements. The appraiser's estimated total value for land and buildings was fairly close to the total cost figure as shown on the corporation's books, but his breakdown values as between land and buildings differed considerably from the book figures. In any event, plaintiff's ultimate decision was that the book value of his common stock, i. e., $46,200,[17] reflected its fair value. Chamblin agreed.

---

17. Actually, this figure was understated by some $3,300 due to an error by the company's accountant in computing the depreciation deduction.

Consequently, on August 31, 1953, plaintiff sold his stock to Lincoln for $46,200. On his income tax return he reported his profit of $45,200 as long-term capital gain. The Commissioner of Internal Revenue, however, included the entire $46,200 in plaintiff's ordinary income on the ground that it was either a dividend or gain from the sale of stock in a collapsible corporation, and assessed a deficiency which plaintiff duly paid. Following disallowance of his claim for refund, plaintiff filed suit in this court.

In its brief and requested conclusions of laws relating to this issue, defendant appears to have abandoned any contention that the $46,200 paid to plaintiff by Lincoln constituted a dividend to him.[18] Hence, the only remaining issue between the parties is whether plaintiff had the requisite view to sell his stock in Parklawn prior to the realization by that corporation of a substantial part of the net income to be derived from its property so that his gain is taxable as ordinary income rather than as capital gain.

 In my opinion, the facts in this case clearly show that plaintiff did not entertain the "view" proscribed by the statute, and, therefore, Parklawn cannot be deemed a collapsible corporation as defined in section 117(m). Despite some early indications to the contrary by the Courts of Appeals for the Second and Fourth Circuits,[19] it now appears to be settled that the view to sale contemplated by section 117(m) must have existed *before completion* of the construction work for which the corporation was formed. Jacobson v. Commissioner of Internal Revenue, 281 F.2d 703 (3d Cir., 1960); Coates v. United States, 6 A.F.T.R.2d 5200 (D.Ore., 1960); Elliott v. United States, 205 F. Supp. 384 (D.Ore., 1962); Charles J. Riley, 35 T.C. 848 (1961); Maxwell Temkin, et al., 35 T.C. 906 (1961); and Southwest Properties, Inc., 38 T.C. 97 1962). In its opinion in the *Jacobson* case, supra, the court stated the correct rule as follows:

On the face of the statute Congress is here indicating a state of mind which must attend and gives significance to certain action. That action, as specified in the statute, is not merely any formation or use of a corporation but rather the formation or use of a corporation to construct or produce property. The "view" with which a corporation is used for a particular purpose must necessarily be a view entertained at the time of such use. Thus, only by a distorting disregard of the phrase "for the * * * construction * * * of property" is it possible to reach the conclusion that the "view to * * * sale" contemplated by the statute can arise for the first time in connection with corporate activity after the work of construction is completed.

\* \* \* \* \* \*

There is no dispute in this case that is certainly not an arbitrary interpretation of the statute, treats a corporation as collapsible only if "the view to sale" shall have existed at the time of the construction in which the corporate entity was used, or if circumstances which subsequently induce sale were themselves within contemplation during the period of construction. We are guided by and shall apply the statute

18. Presumably, the failure to press the dividend theory is due to the fact that, under the transaction described above, plaintiff received nothing from Parklawn when he sold its stock, and he was not a stockholder of Lincoln. Cf. Rev. Rul. 55–15, 1955–1 C.B. 361, revoked by Rev.Rul. 59–97, 1959–1 C.B. 684.

19. See Burge v. Commissioner of Internal Revenue, 253 F.2d 765, 74 A.L.R.2d 664 (4th Cir., 1958); Glickman v. Commissioner of Internal Revenue, 256 F.2d 108 (2d Cir., 1958); and Sidney v. Commissioner of Internal Revenue, 273 F.2d 928 (2d Cir., 1960). Cf. Braunstein v. Commissioner of Internal Revenue, 305 F. 2d 949 (2d Cir., 1962), aff'd 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963) and Commissioner of Internal Revenue v. Solow, 333 F.2d 76 (2d Cir., 1964). In the latter case, the court refers to its earlier comments on this subject as "dictum." 333 F.2d 80.

as thus reasonably interpreted in the regulations. 281 F.2d 705–706.

There is no dispute in this case that "construction" of Parklawn was completed, and its housing units were fully occupied, not later than the end of the year 1951, or some twenty months prior to plaintiff's sale of his Parklawn stock.[20] He testified that he had never given any thought to selling the stock prior to Chamblin's suggestion in August 1953, and nothing in the record justifies an inference to the contrary. Indeed, the evidence is compelling that plaintiff's decision to sell the stock was attributable, in the words of the regulation, "solely to circumstances which arose after the * * * construction * * *." It was long after completion of the construction that plaintiff's father began to complain of his and Lincoln's inactivity. Similarly, it was not until January 1953 that the "grandfather trust" was created by Tibbals, Sr. for the benefit of plaintiff's children. Yet these after-arising circumstances, according to Chamblin, were the very factors which gave rise to his recommendation that plaintiff sell his Parklawn stock to Lincoln. These constitute "compelling facts" which, under the regulation, are sufficient to negate any prior existence of a "view" to sell.[21]

However, defendant insists that in any event the foregoing after-arising circumstances could and should have been reasonably anticipated by plaintiff during the construction period. If this be true, the regulation infers the existence of the proscribed view as contended for by defendant. The argument is that plaintiff could have taken care of his father's restlessness by some other type of contractual arrangement, such as a renewal of the previous management contract, and that plaintiff's true motive in selling his Parklawn stock to Lincoln was to give the property to his children at a nominal bargain price.

The relevance of this argument on the question of foreseeability is not at all apparent. It does not explain why plaintiff, during the Parklawn construction period, should have either foreseen restlessness by his father arising out of subsequent events, or should have anticipated that more than a year after construction was completed his father would create a trust for plaintiff's children, much less that the Lincoln stock would be an asset of the trust. There is simply nothing in the record to justify a conclusion that plaintiff should have reasonably anticipated these subsequent occurrences which gave rise to Chamblin's recommendation.

It may be, as defendant suggests, that plaintiff was partly motivated in this transaction by a desire to see his children obtain the beneficial interest in Parklawn at a "nominal bargain price." [22] If so, however, such estate tax motivation would seem logically to have arisen after the creation of the Tibbals, Sr. trust, and this is still another factor negating the existence of the "view" requisite to collapsible treatment. The taxpayer at whom section 117(m) aims is typically the one striving to get as much

20. No reported case involving this issue has been found wherein the lapse of time between completion of construction and the sale of stock was anywhere near as long. The cases decided adversely to the taxpayer disclose time intervals ranging from one month (Sidney v. Commissioner of Internal Revenue, 273 F.2d 928 (2d (Cir., 1960)) to a maximum of twelve months (Tobias v. Commissioner, 40 T.C. 84 (1963)).

21. Moreover, had plaintiff been thinking in terms of the collapsible corporation provisions of the Code, it is logical to infer that he would have postponed the sale of his Parklawn stock until the end of 1954. By that time, of course, three years would have elapsed since completion of construction, and the exception specified in section 117(m) (3) (C) would have clearly removed the sale from collapsible treatment. Standing alone, his failure to so postpone the sale might have little significance, but when coupled with the other facts of record discussed above, it lends credence to his testimony that prior to August 1953 he had no "view" to sell.

22. Subsequent earnings of Parklawn indicate that its stock was probably worth more than the book value of $46,200.

in the way of capital gain proceeds for his stock as possible, not one bent on giving it away or even selling it at a bargain.

In short, the evidence in this record shows clearly that, at no time during the construction of Parklawn Manor, did plaintiff entertain a view to sell his stock prior to the realization by Parklawn of a substantial part of the net income to be derived from the property. Accordingly, Parklawn was not a collapsible corporation, and plaintiff is entitled to treat the proceeds derived from his sale of its stock as capital gain. It is, therefore, unnecessary to consider the arguments of the parties dealing with the subsidiary question of whether, prior to the sale of plaintiff's stock, Parklawn had realized a substantial part of the net income to be derived from its property.

WHITAKER, Senior Judge (dissenting in part):

I cannot agree with that portion of the opinion of the court which denies plaintiff capital gains treatment on the gain realized from the sales to Cozy Cottages, Inc. and Arlington Ridge Development Co.

To attribute to plaintiff the activities of the Arlington Ridge Development Co. on the ground that it acted as plaintiff's agent seems to me tantamount to a complete disregard of the separate entity of the corporation.

Plaintiff organized the corporation to construct houses on the vacant lots and to sell them to customers in the ordinary course of the corporation's trade or business. He apparently did not want to engage in this business in his individual capacity as he had done in 1946 and 1947. That he had a legal right to do this admits of no doubt.

Once the lots were transferred to the corporation, everything that was done toward constructing houses on the lots and selling them was a corporate activity. Whatever plaintiff may have done with regard to the lots after they had been transferred to the corporation was,

and could only have been, as an officer of the corporation. He did not act, and could not have acted, in his individual capacity with regard to them. Since he had no control, in his individual capacity, over the construction of houses on the lots and the sale of the lots by the corporation, it could not be said to have acted as his agent, in the sense that the acts of the agent are the acts of the principal.

Trial Commissioner Fletcher's opinion deals adequately, and I think correctly, with the question presented in part I of the majority opinion. I would adopt his opinion as the opinion of the court. The portion of his opinion not contained in the majority opinion follows:

"Are the activities by plaintiff sufficient to warrant the inference that, despite his assertions to the contrary, he actually intended to and did hold his one-half interest in the River Ridge lots 'primarily for sale to customers in the ordinary course of his trade or business'? Judge Whitaker has recently phrased the question more succinctly when he said, 'The question is, was plaintiff in the real estate business.' William J. Miller v. United States, 168 Ct.Cl. 498, 339 F.2d 661 (1964). In answering that question, he noted that 'other cases are not very helpful' but went on to observe [168 Ct.Cl. at 504, 339 F.2d at 663] that a few useful tests have been judicially developed, such as:

'* * * the purpose for which the property was acquired, the motive for selling it, the taxpayer's method of selling the land, his income from the sale of it compared with his other income, the extent of the improvements made to facilitate the sale of it, the frequency and continuity of sales, and the time and effort expended by taxpayer in promoting the sales in relation to his other activities. * * *' [Citing cases]

"When these tests are applied to plaintiff *as an individual taxpayer*, it is reasonably clear that he was not engaged in the real estate business and did not hold his interest in River Ridge for sale to

customers in the ordinary course of *his* trade or business. Putting to one side for the moment any consideration of the activities being carried on by plaintiff's closely-held corporations, the record supports plaintiff's assertion that he and his brother acquired the property in question as an investment. They were motivated by the conviction that the land would rapidly increase in value due to its favorable location, a conviction which proved to be well-founded. Consistent with their claim of investor status was the method of selling the land. Neither plaintiff nor his brother spent any significant time or effort in promoting sales. Except for the small sale to Cozy Cottages for experimental purposes, the two main sales were in bulk and were accomplished without solicitation. This is not the type of retailing operation which one expects to find in the case of a real estate dealer. In fact, the record shows that had plaintiff and his brother desired to undertake the expense and trouble of a retailing operation by selling individual lots rather than in bulk, they would have realized approximately one-third more gain from such a method of selling. As the Tax Court observed in Charles' case, the absence of motive to make a greater profit is an element indicating that the property was not held primarily for sale to cusomers in the ordinary course of a trade or business.

"During the four-year period over which plaintiff received his share of the sales proceeds, he was actively engaged in the practice of architecture and in managing his several corporations. His gain from the River Ridge sales only amounted to a little less than 30 percent of his total income from all sources.

"It is true, of course, that plaintiff was quite active in the successful effort to persuade the Franklin County officials that water, sewer, and road improvements should be installed in River Ridge. While such activity frequently taints the owner with the status of a dealer or developer, it is also consistent with the desire of an investor to enhance the market value of his property as a whole and to make his capital asset more readily salable. See Fahs v. Crawford, 161 F.2d 315 (5th Cir. 1947); Boomhower v. United States, 74 F.Supp. 997 (D.Iowa 1947); and Ayling v. Commissioner, 32 T.C. 704 (1959). Unlike those cases where the taxpayer himself installed and paid for the improvements (see, for example, William J. Miller v. United States, supra [1]), the River Ridge, improvements were installed not by plaintiff but by the county and were paid for by special assessments against all lot owners. It is also significant to recall that the subdividing of River Ridge into lots was not done by plaintiff but by the prior owner.

"Thus, when viewed strictly in his individual capacity, plaintiff has carried the burden of showing that, like his brother, he did not hold the property in question primarily for sale to customers in the ordinary course of *his* trade or business. However, this does not end the inquiry. Defendant vigorously asserts that, in determining plaintiff's status the court must look also to the activities of plaintiff's closely-held corporations. The argument is that there then comes into view the true nature of plaintiff's overall business, namely, a completely integrated construction and real estate business.

"There would be considerable merit to defendant's contention were it permissible for the court either to disregard the corporate entities involved or to say that their businesses were plaintiff's businesses. Through a combination of his individual talents as an architect with the building supply and construction capacities of several closely-held corporations, plaintiff can, and has, developed real estate projects from the design stage to the sale of the finished product. Several of his corporations are engaged solely in the construction and holding of houses for sale to their customers. In short, they are in the real estate business.

---

1. The same is true of Browne v. United States, 356 F.2d 546, 174 Ct.Cl. —— (February 1966).

"To defendant, these facts lead inexorably to the conclusion that plaintiff is also individually engaged in the real estate business. Yet, no suggestion is made that these corporations are sham organizations with no business purpose. So far as the record shows, they have been treated as separate taxable entities, and no effort has been made to attribute their income, losses, deductions, etc. to plaintiff. It is only their business which defendant would attribute to plaintiff.

"However, it has long been settled that, in determining the trade or business of a taxpayer, the business activities of his closely-held corporation will not be attributed to the taxpayer. See for example, Whipple v. Commissioner, 373 U.S. 193 [83 S.Ct. 1168, 10 L.Ed.2d 288] (1963); Burnet v. Clark, 287 U.S. 410 [53 S.Ct. 207, 77 L.Ed. 397] (1932); Watson v. Commissioner, 124 F.2d 437 (2d Cir. 1942); Jarvis v. Commissioner, 32 T.C. 173 (1959); Gordy v. Commissioner of Internal Revenue, 36 T.C. 855 (1961) Acq. 1964–2 C.B. 5; and Fink v. Commissioner, 23 C.C.H. Tax Ct.Mem. 475 (1964). In the *Gordy* case, supra, the Tax Court had occasion to consider the status of a taxpayer who, like plaintiff, was the controlling stockholder in a number of corporations engaged in the real estate business. In holding that the taxpayer's sale of a tract of land to one of his residential development corporations resulted in capital gain, the Tax Court stated at 36 T.C. 859–860:

'All that we have here are two isolated transactions. They are transfers of property by petitioner, the president of two corporations, to each of the two corporations both of which were engaged in the business of real estate development, including the sale of lots to individual purchasers and both of which were controlled (60 percent) by petitioner. We see nothing in this record which would warrant the conclusion that at the time of the transfer petitioner held this property primarily for sale to customers in the ordinary course of *his* trade or business.

'Respondent's argument ignores the corporate entities of which petitioner was merely an executive officer. It attributes the corporation's sales of lots to individual purchasers, to petitioner. Respondent recognizes no distinction between a taxpayer holding property for sale to his customers and a taxpayer holding property for sale to his controlled corporation engaged in selling such property to its customers. Petitioner's business was that of a corporate executive. There is no justification for imputing the real estate activities of the many corporations he owns, or controls, to him. Such transactions as are here involved might be vulnerable to a conflict-of-interest charge against the corporate executive but they furnish no grounds for holding the corporation's business is the executive's business.

'The separateness of the corporate officer's business and the business of the corporation he represents has long been recognized.'

"Accordingly, it is clear that the real estate business being carried on by plaintiff's closely-held corporations is not to be considered as 'his trade or business' within the meaning of the statute. Even so, says defendant, it is an accepted principle that a taxpayer may, and frequently does, carry on a real estate business through agents whose activities are clearly attributable to the principal. From this premise, defendant argues:

' * * * Tibbals formed a corporation whenever some specific project came along, and specifically formed the Arlington Ridge Development Company to build houses in River Ridge. In addition, when the lots were acquired, taxpayer owned two construction companies, two lumber companies, and a prefabricated housing manufacturing company. Taxpayer may not have spent much time with any one business, but he controlled those corporations, he made a practice of acquiring property in his own name which he later conveyed to his corporations, and he was the one benefiting

from their activities. We submit that his corporations acted as his agents in the conduct of his affairs.'

"With one exception, all of the cases relied upon by defendant as supporting its contentions are distinguishable in that they involved either a closely-held corporation, trustee, or independent person acting as agent in the development and subsequent sale of land *owned by the* *taxpayer*. For example, in Kaltreider v. Commissioner, 255 F.2d 833 (3rd Cir. 1958), it appears that the bulk of the real estate involved was never sold by the taxpayers to their closely-held corporation. It merely acted as an agent in constructing homes on its stockholders' land, upon completion of which it advertised the completed homes and negotiated their sale. For the most part, the sales price was paid by the purchaser directly to the stockholders who executed the deeds of conveyance as grantors.[2] In their original tax returns, the

"2. It is true that in the present case, record title to many of the 100 lots sold by plaintiff and Charles to Arlington Ridge Development Company remained in plaintiff's name, and upon a sale by the Development Company the deed of conveyance ran directly from plaintiff to the purchaser although plaintiff did not receive the purchase price. Plaintiff's local attorney testified that this was merely a short-cut to avoid the trouble and expense of two deeds. In any event, defendant does not appear to dispute the validity of the brothers' sale to the Development Company. Under Ohio law, from the time of that contract of sale, the company was the owner of the land by equitable conversion. See Berndt v. Lusher, 40 Ohio App. 172, 178 N.E. 14 (1931)."

stockholders reported the profit on these sales in their individual tax returns rather than in the returns of their corporation. They were held to be engaged in the real estate business with the corporation merely acting as their agent to construct the houses and negotiate the sale thereof.

"The exception referred to is the case of Engasser v. Commissioner, 28 T.C. 1173 (1957). There the sale in question was by the taxpayer to a closely-held corporation which intended to construct houses thereon and sell them in the regular course of its business. In this respect the sale was similar to the sale by plaintiff and his brother of the 100 River Ridge lots to plaintiff closely-held corporation, Arlington Ridge Development Company. However, it was not that one sale which persuaded the Tax Court to place the taxpayer in the real estate business. To the contrary, the taxpayer's long history of engaging in the general contracting and home construction business placed him *individually* in the business of buying and selling real estate. In fact, he had no other business. By contrast, plaintiff for the reasons stated above was not individually engaged in the real estate business.

"Accordingly, plaintiff's share of the gain realized from the sale of the River Ridge lots should be taxed to him as long-term capital gain."